**JSC FOREIGN ECONOMIC ASSO-
CIATION TECHNOSTROYEX-
PORT, Plaintiff,**

v.

**INTERNATIONAL DEVELOPMENT
AND TRADE SERVICES, INC.,
et al., Defendants.**

No. 03 Civ. 5562(JGK).

United States District Court,
S.D. New York.

Sept. 6, 2005.

Craig L. Lowenthal, Ira M. Feinberg, Matthew A. Michaels, Tracey A. Tiska, Hogan & Hartson LLP, New York City, for JSC Foreign Economic Association Technostroyexport, Plaintiff.

Barry A. Bohrer, Elizabeth Small, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, Ari S. Zymelman, Jonathan, P. Graham, Williams & Connolly, L.L.P., Washington, DC, for International Development and Trade Services, Inc., Defendant.

Ari S. Zymelman, Jonathan P. Graham, Christopher Nicholas Manning, Williams & Connolly, L.L.P., Washington, DC, Barry A. Bohrer, Elizabeth Small, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., David B. Newman, Sonnenschein Nath & Rosenthal LLP, New York City, for Edith Reich, Brigitte R. Jossem also known as Brigitte Jossem-Kumpf, Defendants.

James Wilson Perkins, Greenberg Trauring, LLP, Joel M. Cohen, Greenberg Traurig, LLP, New York City, for M & B Oxford 41, Inc., P & F Equities, Inc., Atrium Square, Inc., Defendants.

James John Mahon, Casey, Mahon & Rooney, LLP, New York City, for Lopers/Noyack, LLC, Defendant and Noyack Path, LLC, Movant.

Mitchell J. Devack, Law Offices of Mitchell J. Devack, Pllc, East Meadow, NY, for Gerald Modell Inc., Movant.

Michael Elliot Salzman, Hughes Hubbard & Reed LLP, New York City, for Christie's Inc., Intervenor.

## OPINION & ORDER

KOELTL, District Judge.

The plaintiff, JSC Foreign Economic Association Technostroyexport ("JSC"), moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment on the first claim for relief of its Second Amended Complaint, seeking a declaration that defendants Edith Reich ("Reich") and Brigitte R. Jossem ("Jossem") are the alter egos of defendant International Development and Trade Services, Inc. ("IDTS"), and are therefore liable for IDTS debts, including this Court's judgment confirming two arbitration awards against IDTS. JSC also seeks a final judgment against defendants IDTS, Reich, and Jossem for liability on this claim pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

## I.

### A.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Services Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it

does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Consol. Edison, Inc. v. Northeast Utils.*, 332 F.Supp.2d 639, 642 (S.D.N.Y.2004).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. T.R.M. Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir.

1998); *Consol. Edison,* 332 F.Supp.2d at 643.

■ While the court is required to draw all reasonable inferences in favor of the non-moving party on a motion for summary judgment, a negative inference may be drawn against the non-moving party if the non-moving party asserts the Fifth Amendment privilege against self-incrimination in response to probative evidence provided by the moving party. *See LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997); *United States v. Certain Real Property and Premises Known as 4003–4005 5th Ave.,* 55 F.3d 78, 82–83 (2d Cir. 1995); *Adelphia Communications Corp. v. Rigas,* 317 B.R. 612, 623–24 (Bkrtcy. S.D.N.Y.2004). While the Fifth Amendment precludes drawing adverse inferences against defendants in criminal cases, it " 'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.' " *LiButti,* 107 F.3d at 121 (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)); *see also id.* at 124–25; *Marine Midland Bank v. John E. Russo Produce Co., Inc.,* 50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205, 210–11 (1980). A " 'party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence.' " *4003–4005 5th Ave.,* 55 F.3d at 83 (*quoting United States v. Taylor,* 975 F.2d 402, 404 (7th Cir.1992)). Moreover, "the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in

the litigation." *Id.; see also LiButti,* 107 F.3d at 124; *Adelphia,* 317 B.R. at 624 & n. 40 (listing cases).

## B.

■ In general, New York courts will pierce the corporate veil "whenever necessary to prevent fraud or achieve equity." *Walkovszky v. Carlton,* 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6, 7 (1966) (internal quotation marks and citation omitted).[1] There is no definitive rule that governs when courts will pierce the corporate veil because the decision "in a given instance will necessarily depend on the attendant facts and equities." *Morris v. N.Y. State Dep't of Taxation and Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993). "Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Id.* at 1160–61.

■ In determining whether the first requirement—that that owners exercised complete domination of the corporation with respect to the transaction attacked— courts will consider a lengthy list of factors outlined in *Wm. Passalacqua Builders, Inc. v. Resnick:* "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the

---

1. Because this is a diversity action, the Court applies the choice of law rules of New York, the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1538–39 (2d Cir.1997). Under New York choice of law principles, the law of the state

of incorporation governs attempts to pierce the corporate veil. *See Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995). Because IDTS was incorporated under New York law (Second Amended Complaint, filed Apr. 24, 2004 ("Compl.")) ¶ 8), the Court applies New York law to determine whether to pierce the corporate veil.

corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Wm. Passalacqua Builders, Inc. v. Resnick,* 933 F.2d 131, 139 (2d Cir.1991).

Although a showing of complete domination is "the key to piercing the corporate veil," the party seeking to pierce the corporate veil must also fulfill the second requirement by demonstrating: 1) the existence of a wrongful or unjust act toward that party, and 2) that the act caused that party's harm. *See Morris,* 603 N.Y.S.2d 807, 623 N.E.2d at 1161; *Guptill Holding Corp. v. State,* 33 A.D.2d 362, 307 N.Y.S.2d 970, 973 (1970), *aff'd,* 31 N.Y.2d 897, 340 N.Y.S.2d 638, 292 N.E.2d 782 (N.Y.1972); *see also Passalacqua,* 933 F.2d at 138. The party seeking to pierce the corporate veil must establish that the owners of the corporation, through their domination of the corporation, "abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Morris,* 603 N.Y.S.2d 807, 623 N.E.2d at 1161; *Guptill Holding Corp.,* 307 N.Y.S.2d at 973.

## II.

The following facts are undisputed unless otherwise noted.

From July 1991 through July 1992, defendant IDTS, incorporated under the laws of New York in 1989, entered into a series of contracts for the sale of metals with the predecessor corporation of AOOT Foreign Economic Association (VO) Technostroyexport ("AOOT"), a Russian state-owned corporation with its principal place of business in Moscow, Russia. (Second Amended Complaint, filed Apr. 23, 2004 ("Amd.Compl.") ¶¶ 7–8, 20; Statement of Material Undisputed Facts of Plaintiff JSC Foreign Economic Association Technostroyexport in Support of Its Motion for Partial Summary Judgment, dated Sept. 17, 2004 ("Pl.Stmt.") ¶ 6; Defendant Edith Reich and Brigitte R. Jossem's Response to Plaintiff's Statement of Material Undisputed Facts in Support of Its Motion for Partial Summary Judgment, dated Oct. 22, 2004 ("Def.Stmt.") ¶ 6.)[2]

Newco AG ("Newco"), a Swiss corporation, acted as sales agent for IDTS in connection with the resale of the metals that IDTS acquired from AOOT. (Pl. Stmt. ¶ 7; Def. Stmt. ¶ 7.) Newco sold the metals IDTS acquired from AOOT to third parties, collected payment from the third parties, deducted its fee, and transferred the remainder, at times, directly to IDTS. (Pl. Stmt. ¶ 7; Def. Stmt. ¶ 7.) Between October 11, 1991, and May 19, 1993, Newco paid IDTS more than $303 million in connection with these metals transactions. (Pl. Stmt. ¶ 8; Def. Stmt. ¶ 8.) At Reich's instruction, nine payments totalling $14,833,843 were made by wire transfer to

---

2. While the defendants dispute whether there is sufficient evidence that the corporation that entered into the contracts is the predecessor of AOOT, the evidence submitted, as described below, establishes that it was the predecessor. In any event, the dispute is irrelevant because, as also described below, there is no reasonable dispute that JSC is the successor of AOOT, the corporation that obtained the judgment enforcing the Arbitration Award, and has standing to enforce that judgment.

Reich's personal bank account at United Mizrahi Bank in Zurich, Switzerland, and the remainder of the $303 million was made by wire transfer to the account of IDTS at the same bank. (Pl. Stmt. ¶ 8; Def. Stmt. ¶ 8.)

AOOT brought two arbitrations against IDTS in Russia for breach of contract, alleging that IDTS had failed to pay for metals it purchased from AOOT. (Pl. Stmt. ¶¶ 1, 9; Def. Stmt. ¶¶ 1, 9.) In 1995, AOOT obtained two arbitration awards totalling $192,715,245.31, and £8,120,045.31, plus interest on both amounts (the "Arbitration Award"). (Pl. Stmt. ¶ 1; Def. Stmt. ¶ 1.) On July 29, 1997, this Court entered a judgment (the "1997 Judgment") in favor of AAOT confirming the Arbitration Award. (Pl. Stmt. ¶ 2; Def. Stmt. ¶ 2.) On March 27, 1998, the Court of Appeals for the Second Circuit affirmed the 1997 Judgment. (Pl. Stmt. ¶ 3; Def. Stmt. ¶ 3.) *See AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Services, Inc.,* 139 F.3d 980 (2d Cir.1998).

In 1996, AOOT created a new charter in which it changed its name to JSC Foreign Economic Association Technostroyexport. (Declaration of Ira M. Feinberg in Support of Plaintiff's Motion for Partial Summary Judgment, dated Sept. 17, 2004 ("Feinberg 2004 Decl."), Ex. B, ¶ 2.4.) Its previous name, AOOT Foreign Economic Association (VO) Technostroyexport, contained an abbreviation of the Russian words meaning "Open Type Joint–Stock Company." (July 6, 2004 Deposition of Victor Dashchinskiy ("Dashchinskiy Dep.") at 105–06, attached at Ex. A to Feinberg 2004 Decl.) Due to a change in Russian law, the company changed its name to begin with the Russian words meaning "Joint Stock Company," which are abbreviated in Russian as "OAO," and in English as "JSC." (Declaration of Viktor I. Velichko, sworn to June 29, 2005 ("Velichko Decl."), ¶¶ 6–8.) The new charter stated that JSC "shall also be the successor of the Foreign Economic Association 'Technostroyexport' in the full amount of its legal rights and obligations.'" (Feinberg 2004 Decl., Ex. B, ¶ 2.4.)

At their depositions, Reich and Jossem each asserted her Fifth Amendment privilege against self-incrimination in response to all questions regarding the activities of IDTS and their domination and control of IDTS. (Pl. Stmt. ¶ 22; Def. Stmt. ¶ 22.) Until its dissolution in 1997, Reich was the president and sole corporate officer of IDTS, and Jossem was its sole director and sole shareholder. (Pl. Stmt. ¶¶ 11, 12; Def. Stmt. ¶¶ 11, 12.) Reich and Jossem conducted all negotiations on behalf of IDTS and made all decisions on behalf of IDTS. (Pl. Stmt. ¶¶ 13, 14; Def. Stmt. ¶¶ 13, 14.) Reich signed all contracts on behalf of IDTS relating to IDTS business dealings with AOOT and Newco, and routinely signed checks issued by IDTS. (Pl. Stmt.¶ 15, 17, Def.Stmt.¶ 15, 17.) At his deposition, Abraham Weiss, an accountant for IDTS, testified that Jossem had the ultimate authority to decide what income would be attributable to IDTS on its tax returns and what income would be reported on Jossem's personal returns, and to decide what expenses IDTS would deduct on its tax returns. (Pl. Stmt. ¶ 46; Def. Stmt. ¶ 46; Apr. 1, 2004 Deposition of Abraham Weiss ("Weiss Dep.") at 176, 288–89, attached at Ex. F to Feinberg 2004 Decl.) Weiss testified that together, Reich and Jossem had the authority to decide whether they would receive bonuses from IDTS, and the amounts of those bonuses. (Weiss Dep. at 218–19.)

At their depositions, Reich and Jossem each again asserted her Fifth Amendment privilege against self-incrimination in response to questions regarding their roles as officers of IDTS and whether IDTS observed corporate formalities. (Mar. 16,

2004 Deposition of Brigitte Jossem ("Jossem Dep.") at 17–19, attached at Ex. E to Feinberg 2004 Decl.; Mar. 11, 2004 Deposition of Edith Reich ("Reich Dep.") at 24–26, attached at Ex. D to Feinberg 2004 Decl.) Although Reich was, at all times, the president of IDTS and its sole officer, Jossem represented that she was president of IDTS when signing and filing a Certificate of Change of Address form on behalf of IDTS with the New York Secretary of State. (Pl. Stmt. ¶ 33; Def. Stmt. ¶ 33.) IDTS did not hold annual shareholder meetings or regular directors' meetings, and did not keep corporate minutes.[3] (Pl. Stmt. ¶¶ 24–26; Def. Stmt. ¶¶ 24–26.) IDTS never filed any biennial statements identifying basic information about the corporation, such as the identity of its Chief Executive Officer ("CEO"), as it was required under New York Business Corporation Law § 408. N.Y. Bus. Corp. Law § 408 (2003). (Pl. Stmt. ¶ 28; Def. Stmt. ¶ 28.) IDTS operated its business from the New York City apartment where Reich resided at the time. (Pl. Stmt. ¶ 27; Def. Stmt. ¶ 27.) IDTS ceased operations in 1994, but did not follow the procedures required to dissolve a corporation under New York Business Corporation Law. N.Y. Bus. Corp. Law §§ 1001–09. (Pl. Stmt. ¶¶ 30–31; Def. Stmt. ¶¶ 30–31.) IDTS failed to file New York State franchise tax returns or pay New York State franchise taxes from 1994 until it was involuntarily dissolved for failure to pay franchise taxes on September 24, 1997. (Pl. Stmt. ¶¶ 29, 32; Def. Stmt. ¶¶ 29, 32.)

At their depositions, Reich and Jossem each further asserted her Fifth Amendment privilege against self-incrimination in response to questions regarding IDTS income, expenditures, capitalization, and bookkeeping. (Jossem Dep. at 21, 28–39; Reich Dep. at 59–69.) The initial capitalization of IDTS was $10,000. (Pl. Stmt. ¶ 38; Def. Stmt. ¶ 38.) As of March 31, 1991, IDTS had total assets of $637 and retained a shareholders' deficit of $43,511. (Pl. Stmt. ¶ 39; Def. Stmt. ¶ 39.) As of March 31, 1992, IDTS had total assets of $71,891, two-thirds of which was in an unidentified escrow account, a retained deficit of $3,581, and a net worth of $6,418. (Pl. Stmt. ¶¶ 40–41; Def. Stmt. ¶¶ 40–41.) As of March 31, 1993, IDTS had retained earnings of $45,588, and a net worth of $55,588. (Pl. Stmt. ¶ 42; Def. Stmt. ¶ 42.) As of March 31, 1994, IDTS had retained earnings of $37,093, and a net worth of $47,093. (Pl. Stmt. ¶ 43; Def. Stmt. ¶ 43.) IDTS federal income tax returns for its fiscal years ending March 31, 1992, 1993, and 1994 show "gross receipts" of $1,056,045, $2,315,180, and $2,071,600, respectively. (Pl. Stmt. ¶ 36; Def. Stmt. ¶ 36.) As of March 31, 1995, IDTS had a retained deficit of $2,756, and a net worth of $7,244. (Pl. Stmt. ¶ 44; Def. Stmt. ¶ 44.) When IDTS dissolved in 1997, its assets consisted of less than $200 and a "claim against Newco A.G. pursuant to

**3.** The Counterstatement of Material Facts filed by Reich and Jossem pursuant to Local Civil Rule 56.1 states that Reich and Jossem "cannot take a position on whether to dispute" the paragraphs of the plaintiff's 56.1 statement that make these allegations. Because, pursuant to Local Civil rule 56.1(c), any paragraph of the moving party's 56.1 statement "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph" in the opposing party's 56.1 statement, these and all other allegations in the plaintiff's 56.1 statement with regard to which defendants Reich and Jossem take no position on whether to dispute are deemed admitted by Reich and Jossem for the purposes of this motion. S.D.N.Y. Local Civ. R. 56.1(c). They are also supported by the inferences to be drawn from the assertion by Reich and Jossem of their Fifth Amendment privilege with respect to all substantive questions about IDTS. (Jossem Dep. at 21, 28–39; Reich Dep. at 16–17, 59–69.)

Trade Service Agreement dated August 7, 1991" for an unspecified amount. (Declaration of Ira P. Feinberg dated Sept. 5, 2003 ("Feinberg 2003 Decl."), Ex. 20 at 3.) At least $303 million of IDTS revenues is not reflected in IDTS books and records. (Pl. Stmt. ¶ 35; Def. Stmt. ¶ 35.)

At their depositions, Reich and Jossem each asserted her Fifth Amendment privilege against self-incrimination in response to questions regarding their alleged diversion of IDTS funds and use of IDTS funds as personal funds. (Jossem Dep. at 33–63; Reich Dep. at 30–37, 51–69.) At all times since he became the accountant for IDTS in late 1992, Weiss took all instructions with respect to the handling of IDTS accounts and records from Reich and Jossem. (Pl. Stmt. ¶¶ 46–47; Def. Stmt. ¶¶ 46–47.) As stated above, at Reich's instruction, at least $14,833,842 from Newco was transferred to Reich's personal Swiss bank account. (Pl. Stmt. ¶ 49; Def. Stmt. ¶ 49.) IDTS paid Jossem at least $1,082,460 in consulting fees from 1991 to 1994, in addition to her salary. (Pl. Stmt. ¶ 50; Def. Stmt. ¶ 50.) In 1993, IDTS paid at least $9,100 to Reich's son, Michael Reich. (Pl. Stmt. ¶ 51; Def. Stmt. ¶ 51.) These payments were described as "consulting" fees, although, at his deposition, Michael Reich could not recall having performed any services for IDTS. (Feinberg 2003 Decl., Ex. 29 at 00464; Apr. 21, 2004 Deposition of Michael Reich ("M. Reich Dep.") at 44.) The IDTS Itemized Categories Report for the period of April 1, 1993, through March 31, 1994, reflects that IDTS paid $156,000 to Smith Barney Shearson for "Brig.InvestmentAMEX." (Feinberg 2003 Decl., Ex. 29 at 000471.) The plaintiff alleges that these funds went to Jossem's personal investment accounts. (Pl.Stmt.¶ 53.) Defendants Jossem and Reich dispute this allegation, and offer no explanation as to what the entries indicate. (Def.Stmt.¶ 53.)

Between 1991 and 1993, approximately $9.9 million of IDTS receipts were classified in IDTS books as "Swiss loans" to Jossem or Reich. (Weiss. Dep. at 184–85, 191; Feinberg 2004 Decl., Exs. N, O, Q, R.) Of this amount, Weiss reclassified $3.25 million of receipts to IDTS as loans to Jossem in the last nine months of 1992. (Weiss. Dep. at 184–85, 191; Feinberg 2004 Decl., Exs. N, O.). Weiss accepted Jossem's representation that this $3.25 million was not IDTS revenue, but rather "Swiss loans" to Jossem personally, without requesting or seeing any documentary evidence of the loans, and without any knowledge of the source of the funds. (Pl. Stmt. ¶ 57; Def. Stmt. ¶ 57.) In 1993, Weiss classified $6.2 million in IDTS receipts as "Swiss loans" to Jossem. (Weiss Dep. at 193–95; Feinberg 2004 Decl. Ex. R.) Weiss neither requested nor received any documentation concerning the loans. (Weiss. Dep. at 193–95.) Weiss classified $370,000 of receipts to the IDTS account as a "Swiss loan" to Reich between 1991 and 1993. (Pl. Stmt. ¶ 54; Def. Stmt. ¶ 54). The plaintiff alleges that the approximately $9.9 million classified as Swiss loans, were, in reality, IDTS revenue. (Pl. Stmt.¶¶ 54–55, 59.) Reich and Jossem have provided no documents demonstrating the origin of the Swiss loans. Between 1991 and 1994, Reich directed IDTS to make charitable contributions to institutions and organizations she supported totalling $22,920, and which, at the direction of Reich or Jossem, were classified as "advertising expenses" on the IDTS financial books. (Pl. Stmt. ¶ 70; Def. Stmt. ¶ 70.) Weiss also served as personal accountant for Reich and Jossem, for which IDTS paid. (Pl. Stmt. ¶ 71; Def. Stmt. ¶ 71.)

The plaintiff alleges, and the defendants dispute, that Reich and Jossem routinely directed IDTS to use IDTS funds to pay their personal expenses. (Pl. Stmt. ¶¶ 66; Def. Stmt. ¶¶ 66.) The $6.2 million in

Swiss loans described above was used to fund the purchase and renovation of four apartments at 422 East 72nd Street in New York City, three of which were subsequently combined to become the residence of Reich and Jossem. (Pl. Stmt. ¶¶ 64–65; Def. Stmt. ¶¶ 64–65.) From October 1991 through February 1993, IDTS paid at least $114,000 to Neal Hurwitz ("Hurwitz"), an attorney who provided legal services to Reich that were unrelated to IDTS, and who did not represent IDTS or provide any legal services to IDTS. (Pl. Stmt. ¶ 67; Def. Stmt. ¶ 57.) At the direction of Reich or Jossem, IDTS paid thousands of dollars to doctors, a pharmacy, an eyeglass retailer, a housekeeping service, and for magazine subscriptions, all of which were personal expenses of Reich and Jossem and had no relation to the business of IDTS. (Pl. Stmt. ¶ 69; Def. Stmt. ¶ 69.)

The plaintiff alleges that IDTS deducted as business expenses on its corporate income tax returns the personal expenses of Reich and Jossem that it paid. (Pl. Stmt. ¶ 73; Feinberg 2004 Decl., Exs. I, J, K, L; Feinberg 2003 Decl., Exs. 24, 25, 28, 29.) Reich and Jossem dispute that there is evidence to support this, arguing that the tax returns refer to categories of expenses that cannot be distinguished as personal or business. (Def.Stmt.¶ 73.) On its tax return for the fiscal year ending March 31, 1993, IDTS deducted depreciation relating to an automobile that Jossem purchased from Zumbach Motors. (Pl. Stmt. ¶ 74; Def. Stmt. ¶ 74.) At his deposition, when asked to whom the automobile belonged, Weiss testified that it was "Brigitte Jossem's car." (Weiss Dep. at 149.)

It is not disputed that Jossem's individual federal income tax returns for 1991, 1992, and 1993 reported that she received annual incomes of $100,262, $416,125, and $768,579, respectively. (Pl. Stmt. ¶ 75; Def. Stmt. ¶ 75.) Reich's individual federal income tax returns for 1991, 1992, and 1993 reported her annual income as $100,152, $106,142, and $152,673, respectively. (Pl. Stmt. ¶ 76; Def. Stmt. ¶ 76.) Reich filed for personal bankruptcy in September 1984, and her bankruptcy case was pending until she was discharged from bankruptcy on February 28, 1995. (Pl. Stmt. ¶ 77; Def. Stmt. ¶ 77.)

Throughout 1992–1995, Jossem and Reich made several purchases of art, antiques, and real estate. On various dates in 1993 and 1994, Jossem spent at least $7.6 million purchasing artwork, jewelry, and other items. (Pl. Stmt. ¶ 79; Def. Stmt. ¶ 79.) In 1992, Reich purchased a residential property in Israel for $700,000, and Jossem purchased two properties in New York for $1,050,000 and $212,000. (Pl. Stmt. ¶¶ 83–85; Def. Stmt. ¶¶ 83–85.) In 1993, Reich purchased a residential property in Israel for $690,000. (Pl. Stmt. ¶ 86; Def. Stmt. ¶ 86.) In 1993, M & B Oxford 41, Inc. ("M & B"), a New York corporation formed by Reich and Jossem, of which Jossem was the sole shareholder and president at the time, purchased three apartments at the same address in New York for $2,477,000. (Pl. St. ¶¶ 88–90; Def. Stmt. ¶¶ 88–90; *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. Trade Services, Inc.,* 295 F.Supp.2d 366, 373 (S.D.N.Y.2003).) On April 12, 1994, Procon Holdings, Inc., and Atrium Square, Inc., of which Jossem was the president and CEO at the time, purchased two additional apartments in the same building for $983,500. (Pl. Stmt. ¶¶ 91–92; Def. Stmt. ¶¶ 91–92.) In 1994 and 1995, Jossem purchased two additional properties in New York for $258,500. (Pl. Stmt. ¶¶ 93–94; Def. Stmt. ¶¶ 93–94.)

### III.

■ The defendants argue that JSC has no standing to bring this case because it cannot establish that it is the successor to

AOOT, the party that obtained the 1997 Judgment which is sought to be enforced in this action.[4] Resolution of this issue is necessary to establish the Court's jurisdiction over this matter because under Article III, Section 2 of the Constitution, federal courts have jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2. It is well-established that a justiciable case or controversy within the meaning of Article III, Section 2 is not presented where the plaintiff lacks standing to prosecute the action. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

"The standing inquiry focuses on whether the plaintiff is the proper party to bring [the] suit" and requires that the alleged injury affect the plaintiff "in a personal and individual way." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); *Lujan,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130; *see also Roe v. Johnson,* 334 F.Supp.2d 415, 420 (S.D.N.Y.2004). JSC, if it is not the legal successor to AOOT, the entity that obtained the 1997 Judgment, would not be the proper party to bring this suit and would lack standing to enforce the 1997 Judgment. It is clear from the parties' submissions, however, that JSC and AOOT are the same corporation and, accordingly, that JSC has standing in this case.

JSC submitted a declaration from Viktor I. Velichko, who served as Chairman of JSC and its predecessors from March 1990 until his retirement in May 2004. (Velichko Decl., ¶ 4.) The Velichko Declaration establishes that the name of the corporation that entered into the 1991 and 1992 contracts with IDTS, VVO Technoexport, contained an abbreviation of the Russian

words meaning "All–Union Foreign Economic Association." (Velichko Decl., ¶ 3.) Following a 1992 reorganization, VVO Technoexport was divided into two companies, with the right to enforce VVO Technoexport's contracts with IDTS assigned to the new corporation VO Technostroyexport. The "VO" in the new corporate name is an abbreviation for the Russian words meaning "Foreign Economic Association." (Velichko Decl., ¶ 5.)

In 1994 VO Technostroyexport was privatized and its name changed again to AOOT Foreign Economic Association (VO) Technostroyexport ("AOOT"), AOOT being an abbreviation for the Russian words meaning "Joint Stock Company of the Open Type." Under Russian legislation the privatized corporation was entitled to all rights previously held by VO Technostroyexport. (Velichko Decl., ¶ 6.) It was AOOT, mistakenly identified as "AAOT Foreign Economic Association (VO) Technostroyexport" due to a typographical error, that obtained the 1997 Judgment in this Court enforcing the Arbitration Award. (Velichko Decl., ¶ 7.)

In 1996, responding to a change in Russian corporate law, AOOT created a new charter resulting in yet another name change, this time to OAO Foreign Economic Association Technostroyexport. (Feinberg 2004 Decl., Ex. B, ¶ 2.4.). "OAO" is the abbreviation for the Russian words meaning "Joint Stock Company," abbreviated in English as "JSC." (Velichko Decl. ¶¶ 6–8.) The new charter stated that JSC "shall also be the successor of the Foreign Economic Association 'Technostroyexport' in the full amount of its legal rights and obligations.'" (Feinberg 2004 Decl., Ex. B, ¶ 2.4.)

---

4. Following argument of the motion the parties provided additional submissions on the question of whether JSC is the same corporation that obtained the 1997 Judgment.

The Declaration of Yuri E. Monastyrsky ("Monastyrsky"), sworn to on June 28, 2005 (the "Monastyrsky Decl."), further establishes that JSC is the same entity that obtained the 1997 Judgment. Monastyrsky, a licensed Russian attorney with a Ph.D. in Private International Law who has authored numerous articles on Russian commercial law, noted that under Russian law in force at the time VO Technostroyexport was privatized in 1994, the newly established AOOT acquired all rights and obligations of its predecessor company. (Monastyrsky Decl. ¶ 6A; RSFSR Law No. 445–1 on Enterprises and Business Activity, Article 37(8), attached at Ex. 2 to Monastyrsky Decl.) AOOT was required by Russian law to adopt the 1996 charter and to change its name to JSC Technostroyexport to reflect its status as a joint stock company. (Monastyrsky Decl. ¶ 6B; Federal Law on Joint Stock Companies, Article 94, attached at Ex. 8 to Monastyrsky Decl.) Monastyrsky therefore concluded that JSC "is the same entity which obtained the arbitration awards and the judgment enforcing those awards." (Monastyrsky Decl. ¶ 4.)

Reich and Jossem submitted in response the Expert Statement of Dr. Eugen Salpius (the "Salpius Statement"). Dr. Salpius is an Austrian attorney with an international practice but does not claim to be admitted to practice law in Russia. In any event, the Salpius Statement does not dispute the central issue in the standing determination: whether JSC, the plaintiff in this action, may enforce the 1997 Judgment obtained by AOOT. Rather, the Salpius Statement concedes that "AOOT 'Technostroyexport' is the same company as OAO 'VO Technostroyexport' "[5] and

that "[n]o change of legal personality" occurred in 1996 when AOOT became JSC. (Salpius Statement, Findings ¶ 4.1, at 21; Salpius Statement, Diagram at 10.) There is also no indication in the Salpius Statement that JSC's subsequent registrations in 1999 and 2002 altered its legal right to enforce the 1997 Judgment in any way.

Therefore it is clear that JSC and AOOT are the same entity. Reich and Jossem have failed to rebut that showing. Indeed, their expert concedes the point. Accordingly, JSC has standing to enforce the 1997 Judgment.

## IV.

## A.

## 1.

■ JSC argues that IDTS was an alter ego of Reich and Jossem, and that piercing the corporate veil is therefore appropriate. Under New York law, "[w]hen a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego, the corporate form may disregarded to achieve an equitable result." *Austin Powder Co. v. McCullough,* 216 A.D.2d 825, 628 N.Y.S.2d 855, 857 (1995) (internal citations omitted). As explained above, New York courts generally look to the ten *Passalacqua* factors when deciding whether such complete domination and control exists: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate

---

**5.** "OAO VO Technostroyexport" is JSC, the plaintiff in this case. As explained above, "OAO" is the abbreviation for the Russian words translating to "Joint Stock Corporation" while "VO" is the abbreviation for the Russian words translating to "Foreign Economic Association." "OAO VO Technostroyexport" and "JSC Foreign Economic Association Technostroyexport" are therefore the same name.

capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Passalacqua*, 933 F.2d at 139.

Reich and Jossem argue that because there is evidence that IDTS conducted legitimate business, IDTS could not be an alter ego of Reich and Jossem under New York law. Reich and Jossem argue that the $225 million that IDTS paid to AOOT in connection with the seventeen contracts made between IDTS and AOOT demonstrate that IDTS was a closely-held corporation conducting legitimate business and therefore not an alter ego. To support their argument, Reich and Jossem rely on cases from Second Circuit and New York courts that found that the diversion of corporate funds and purchases of private items using corporate funds by officers or directors could not alone justify piercing the corporate veil. *See, e.g., United States v. Funds Held in the Name of Wetterer*, 210 F.3d 96, 108 (2d Cir.2000); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134–35 (2d Cir.1997); *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979); *Canario v. Lidelco, Inc.*, 782 F.Supp. 749, 760 (E.D.N.Y.1992); *Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 986–87 (1976).

This argument, however, misconstrues the requirements for piercing the corporate veil. It is unnecessary for the plaintiff to show that IDTS conducted no legitimate business in order for the Court to find that Reich and Jossem dominated and controlled IDTS such that it was their alter ego; rather, the plaintiff must show that whatever business the corporation did conduct was carried out by individuals who failed to respect the separate identity of the corporation and used it as an "agent ... to pursue their own ends." *Passalacqua*, 933 F.2d at 139. Indeed, the absence of legitimate business is not even one of the ten factors listed in *Passalacqua* for courts to consider when making this determination. *Id.*

The cases that Reich and Jossem cite are consistent with this analysis because, rather than seeking to determine whether the corporation engaged in any legitimate business, they balance the *Passalacqua* factors to determine whether the business conducted by the corporation was, in reality, primarily the business of the alleged dominators. *See, e.g., Wetterer*, 210 F.3d at 107–09 (reversing district court holding the corporation was alter ego where only evidence of domination was three questionable transactions where alleged dominator allegedly channeled corporate funds to himself and relatives); *American Fuel Corp.*, 122 F.3d at 134–35 (reversing district court holding that corporation was dominated where, balancing factors in *Passalacqua*, there was significant evidence that alleged dominator did not dominate corporation, including lack of evidence that he used corporate funds for personal matters or intermingled corporate funds with his own); *Gartner*, 607 F.2d at 587 (reversing district court holding piercing corporate veil where facts showing that corporation lacked separate books, files, and office space from other corporations suggested corporation "was simply one arm of

a larger corporate combine" and one occasion of using corporate funds for personal matters did not demonstrate that defendant used corporation to conduct his purely personal business); *Canario,* 782 F.Supp. at 759–60 (refusing to pierce corporate veil where there was no evidence of lack of corporate formalities or inadequate capitalization, and only evidence of domination was the purchase of plane using corporate funds and taking of personal income tax deductions for its depreciation while corporation paid for its upkeep); *Port Chester,* 389 N.Y.S.2d 327, 357 N.E.2d at 986 (refusing to pierce corporate veil where "the external indicia of separate corporate identities were at all times maintained").

Therefore, the issue is whether there is a material issue of fact as to whether Reich and Jossem dominated IDTS such that they failed to respect its distinct corporate identity, as demonstrated by the ten factors outlined in *Passalacqua,* and whether that domination was used to commit a fraud or wrong against the plaintiff that resulted in the plaintiff's injury.

JSC has provided significant evidence that IDTS failed to comply with basic corporate formalities. As explained above, IDTS did not hold any annual shareholder meetings or regular directors' meetings (Pl. Stmt. ¶¶ 24–25; Def. Stmt. ¶¶ 24–25.) IDTS did not keep corporate records such as corporate minutes, and IDTS bookkeeping was inadequate, as evidenced by the undisputed fact that at least $303 million in IDTS revenues are not reflected in its books. (Pl. Stmt. ¶¶ 26, 35; Def. Stmt. ¶¶ 26, 35.)

Moreover, IDTS did not comply with several basic corporate obligations under New York law. IDTS never filed biennial statements identifying basic information about the corporation, such as the identity of its CEO, as it was required to do by New York Business Corporation Law

§ 408. N.Y. Bus. Corp. Law § 408 (2003). (Pl. Stmt. ¶ 28; Def. Stmt. ¶ 28.) IDTS did not follow the procedures required to dissolve a corporation under New York Business Corporation Law when it ceased operations. N.Y. Bus. Corp. Law §§ 1001–09. (Pl. Stmt. ¶¶ 30–31; Def. Stmt. ¶¶ 30–31.) IDTS failed to file New York State franchise tax returns or pay New York State franchise taxes from 1994 until September 24, 1997, when it was involuntarily dissolved for failure to pay franchise taxes. (Pl. Stmt. ¶¶ 29, 32; Def. Stmt. ¶¶ 29, 32.) Reich and Jossem refused to answer any questions with respect to IDTS's adherence to corporate formalities or its bookkeeping.

It is also clear that IDTS was undercapitalized. The initial capitalization of IDTS was $10,000. Between 1991 and 1994, despite the fact that IDTS conducted purchases and sales involving hundreds of millions of dollars, IDTS records reflect that, at the end of the fiscal year ending March, 31, 1991, IDTS was insolvent, and that at the end of the fiscal years ending March 31, 1992, 1993, and 1994, its net worth was $6,418, $55,588, and $47,093, respectively. (Pl. Stmt. ¶¶ 39–43; Def. Stmt. ¶¶ 39–43.) Reich and Jossem invoked their Fifth Amendment privilege against self-incrimination in response to all questions regarding the capitalization of IDTS, and have provided no evidence in response to the plaintiff's evidence that IDTS was undercapitalized. (Jossem. Dep. at 21, 28–39; Reich Dep. at 59–69.)

The evidence also establishes without reasonable dispute that Reich and Jossem diverted funds from IDTS for their personal purposes. As explained above, millions of dollars in payments from Newco related to its transactions with IDTS were wired directly into Jossem's Swiss bank account at Jossem's direction. (Pl. Stmt. ¶ 49; Def. Stmt. ¶ 49.) At the direction of

Jossem and Reich, IDTS paid Jossem $1,082,460 in consulting fees in addition to her salary, and $9,100 to Reich's son, Michael Reich, even though there is no evidence that Jossem or Michael Reich provided any consulting services to IDTS. (Pl. Stmt. ¶ 50; Def. Stmt. ¶ 50; Weiss Dep. at 218–19.) IDTS also paid $156,000 to Smith Barney Shearson for "Brig.InvestmentAMEX," which the plaintiff identifies as Jossem's personal investment fund, and for which Reich and Jossem offer no alternative explanation. (Pl. Stmt. ¶ 53; Def. Stmt. ¶ 53.) Furthermore, at the direction of Reich and Jossem, approximately $9.9 million of IDTS receipts were classified as "Swiss loans" to Jossem or Reich between 1991 and 1993, $6.2 million of which was used to fund the purchase and renovation of apartments that later became the personal residence of Reich and Jossem. (Weiss Dep. at 184–85, 192–95; Feinberg 2004 Decl. Exs. N, O, Q, R.) Jossem and Reich offer no evidence as to the origin of these loans in response to the plaintiff's allegation that this money was IDTS revenue that Jossem and Reich reclassified as loans to themselves. Reich and Jossem asserted their Fifth Amendment privilege against self-incrimination in response to all questions regarding these transactions. (Jossem Dep. at 33–63; Reich Dep. at 19–20, 30–37, 51–69.)

These diversions of IDTS funds occurred at the same time that Reich and Jossem were making several significant purchases of real estate, art, antiques, that were disproportionate to their incomes. As described above, in 1993 and 1994, Jossem spent at least $7.6 million on artwork in Israel, and in 1992, 1994 and 1995, Jossem purchased real estate for a total of approximately $1.5 million. (Pl. Stmt. ¶¶ 79, 83–84; Def. Stmt. ¶¶ 79, 83–84.) However, Jossem's tax returns for 1991, 1992, and 1993 reported her income as $100,262, $416,125, and $768,579, respectively. (Pl. Stmt. ¶ 75; Def. Stmt. ¶ 75.)

In 1992 and 1993, Reich purchased property in Israel for $1.4 million, despite the fact that she was not discharged from bankruptcy until 1995, and that her tax returns for 1991, 1992, and 1993 reported her income as $100,152, $106,142, and $152,673, respectively. Reich and Jossem offer no evidence as to the origin of the funds for these purchases.

There is also uncontradicted evidence that IDTS funds were often used to pay the personal expenses of Reich and Jossem directly. Aside from the purchase and renovation of the apartments described above, IDTS paid $114,000 to Reich's personal attorney for services unrelated to IDTS, and to Weiss for personal accounting services separate from his work for IDTS. (Pl. Stmt. ¶¶ 67, 71; Def. Stmt. ¶¶ 67, 71.) IDTS paid thousands of dollars for personal services or goods provided to Jossem and Reich, none of which were related to IDTS business. (Pl. Stmt. ¶ 69; Def. Stmt. ¶ 69.) As described above, there is also evidence that IDTS reported as business expenses on its income tax returns personal expenses of Reich and Jossem. (Pl. Stmt. ¶¶ 73–74; Def. Stmt. ¶¶ 73–74.) Reich and Jossem dispute there this is evidence to support this, arguing that the tax returns refer to categories of expenses that cannot be distinguished as personal or business. (Def.Stmt.¶ 73.) However, Reich and Jossem do not address why, for example, the amount IDTS deducted for legal expenses in its tax return for the fiscal year ending March 31, 1993, corresponds to the sum of the amount IDTS paid for legal expenses and the amount that Reich and Jossem paid for legal expenses that fiscal year as reflected in the Transaction Reports for their personal accounts. (Feinberg 2004 Decl. Exs. J at 000002, U at 73, W at 407, 412, V at 385; Feinberg 2003 Decl. Ex. 25 at 244.) At their depositions, Reich and Jossem asserted their Fifth Amendment privilege

against self-incrimination with regard to questions about IDTS payments of their personal expenses. (Reich Dep. at 22–23, 51–58; Jossem Dep. at 41–57.)

The plaintiff has demonstrated sufficient evidence to shift the burden to Reich and Jossem to offer "specific facts showing that there is a genuine issue for trial" pursuant to Rule 56(e) of the Federal Rules of Civil Procedure. The above evidence, together with the facts that Reich and Jossem were the sole shareholder and officer of IDTS, conducted all its negotiations, signed all of its contracts, and had the ultimate authority to determine where its income would go and how it would be recorded, demonstrate that Reich and Jossem dominated and controlled IDTS, abused the corporate form, and used it for their personal purposes. However, Reich and Jossem have offered no evidence in response to the plaintiff's proffered evidence. Although in their statement submitted pursuant to Local Rule 56.1, Reich and Jossem disputed that the evidence cited supported many of the allegations made in the plaintiff's statement submitted pursuant to Rule 56.1, this is insufficient to defeat a motion for summary judgment. When a moving party makes an initial showing that there is no material issue of fact, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan,* 996 F.2d at 532; *see also Scotto,* 143 F.3d at 114–15. Reich and Jossem cannot allege that there is a material issue of fact based on their assertion of the Fifth Amendment privilege against self-incrimination. A "party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence." *4003–4005 5th Ave.,* 55 F.3d at 82. Moreover, "the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present suffi-

cient evidence to satisfy the usual evidentiary burdens in the litigation." *Id.; see also LiButti,* 107 F.3d at 124; *Adelphia,* 317 B.R. at 624 n. 40 (listing cases).

JSC has demonstrated that Reich and Jossem disregarded IDTS's separate corporate identity, using IDTS as their alter ego. Because Reich and Jossem have provided no evidence contradicting the evidence submitted by the plaintiff, there is no material issue of fact with regard to whether Reich and Jossem dominated and controlled IDTS for the purposes of piercing the corporate veil.

**2.**

■ JSC argues that Reich and Jossem used their domination and control of IDTS to commit a wrong against JSC by draining IDTS of its assets so that it would be unable to comply with its contractual obligations as determined by the arbitration panel, and the resulting judgment confirming the arbitration awards.

It is plain that the domination and control by Reich and Jossem was the proximate cause of the wrong asserted by JSC. As described above, $303 million in receipts is unaccounted for in IDTS books. (Pl. Stmt. ¶ 35; Def. Stmt. ¶ 35.) There is also evidence that, at the time these receipts were accruing to IDTS, Reich and Jossem were diverting payments from Newco into personal accounts, and reclassifying receipts as "Swiss loans" to themselves. As a result, IDTS was unable to comply with its contractual obligations as determined by the arbitration awards against it, resulting in a wrong to AOOT. Given that IDTS entered into the contracts with AOOT that created those obligations in the period of July 1991 through July 1992, Reich and Jossem were on notice of a potential judgment against IDTS when they diverted the funds. *Godwin Realty Assocs. v. CATV Enters., Inc.,* 275 A.D.2d 269, 712 N.Y.S.2d 39, 41 (2000)

(piercing corporate veil after finding that defendant was on notice of claim even though no action had been commenced at time of liquidation of corporate assets). Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced. *See id.; see also Cordius Trust v. Kummerfeld,* 99 Civ. 3200, 2004 WL 616125, at *8–9 (S.D.N.Y. Mar. 3, 2004.)

Reich's and Jossem's arguments that the plaintiff has not established causation are unavailing. Reich and Jossem argue that the plaintiff has not alleged a fraud. However, the plaintiff is not required to demonstrate fraud for the Court to pierce the corporate veil; under New York law, the plaintiff must show that the alleged dominator's "domination was used to commit a *fraud or wrong* against the plaintiff which resulted in the plaintiff's injury." *Morris,* 603 N.Y.S.2d 807, 623 N.E.2d at 1160–61 (emphasis added); *see also Passalacqua,* 933 F.2d at 141 (finding that, under New York law, plaintiff seeking to pierce corporate law was not required to prove fraud). Reich and Jossem also argue that there is no causation because the funds were diverted before the arbitration was commenced. However, the original wrong committed against AOOT was IDTS's failure to fulfill its contractual obligations, which resulted in the arbitration award and judgment against IDTS. Moreover, as stated above, the diversion of funds before a claim is made but after a defendant has notice of a potential claim can constitute a wrong for the purposes of piercing the corporate veil. *Godwin,* 712 N.Y.S.2d at 41. Finally, Reich and Jossem have not provided any evidence disputing that their domination of IDTS was used to perpetrate a wrong against AOOT in the form of the inability of IDTS to comply with its contractual obligations and to pay the resulting arbitration award and judgment

against it. Therefore, there is no material issue of fact with regard to whether Reich and Jossem used their domination and control of IDTS to perpetrate a wrong against AOOT.

## B.

■ Reich and Jossem argue that the plaintiff's alter ego claim is barred under the doctrine of "unclean hands." This doctrine provides that "the equitable powers of this court can never be exerted on behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." *PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488, 493 (2d Cir.2004) (internal citation and quotation marks omitted). The doctrine is applied where the party asking for the invocation of an equitable doctrine has committed an unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the defense. *Dunlop–McCullen v. Local 1–S, AFL–CIO–CLC,* 149 F.3d 85, 90 (2d Cir.1998); *PenneCom,* 372 F.3d at 493; *Weiss v. Mayflower Doughnut Corp.,* 1 N.Y.S.2d 310, 152 N.Y.S.2d 471, 135 N.E.2d 208, 210 (1956).

Reich and Jossem argue that the doctrine of unclean hands is applicable here because of evidence that AOOT accepted bribes in the course of its dealings with IDTS. They offer evidence in the form of the deposition testimony of Margaret Donovan, a former administrative assistant for IDTS, stating that she observed Reich making wire transfers of money to Viktor Velichko, a senior official at AOOT, that Reich was ambiguous about the nature of the transfers, and that Reich "thought that Mr. Velichko had become a pretty rich man at her expense and now was not delivering on what he had promised to deliver . . . ." (Apr. 30, 2004 Deposition of Margaret Donovan ("Donovan Dep.") at

96–98, attached at Ex. I to Declaration of David B. Newman in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated Oct. 22, 2004 ("Newman Decl.").) Reich and Jossem also point to evidence that Reich purchased an apartment in Tel Aviv and allowed Joseph Brukhis, an employee of Norilsk Nickel ("Norilsk"), for whom AOOT served as an agent, to live there rent-free and eventually keep all proceeds from the apartment's sale. (Affidavit of Meshulam M. Rath dated Oct. 20, 2004 ("Rath Aff.") and Ex. 1 attached thereto, attached at Ex. C to Newman Decl.; Ex. D to Newman Decl.) Jossem and Reich argue that this evidence creates a material issue of fact as to whether the defense of unclean hands applies. Jossem and Reich request, in the alternative, that the resolution of this motion be postponed to allow time for discovery on the applicability of an unclean hands defense.

This argument is without merit. Reich and Jossem cannot avail themselves of the defense of unclean hands because unclean hands is an equitable defense that does not apply to actions at law that seek money damages. *See Aneiro Concrete Co. v. N.Y. City Constr. Auth.*, No. 94 Civ. 3506, 2000 WL 863208, at *10 (S.D.N.Y. June 27, 2000); *Natcontainer Corp. v. Cont'l Can Co.*, 362 F.Supp. 1094, 1098 (S.D.N.Y.1973) ("The interposition of the defense of unclean hands against relief in the form of money damages is clearly improper.") This Court has previously held that this claim is an action at law for money damages. *See JSC*, 295 F.Supp.2d at 388–89 ("The plaintiff here . . . brings an action at law primarily for a money judgment against the defendants."). The defense of unclean hands is therefore unavailable to the defendants. *See Aniero Concrete*, 2000 WL 863208 at *10; *Natcontainer*, 362 F.Supp. at 1098.

Even if the defense of unclean hands were available to Jossem and Reich in this action, it would still be inapplicable. As described above, the defense of unclean hands must involve a wrong committed by the plaintiff that is related to the issue for which the plaintiff seeks relief. *Dunlop–McCullen*, 149 F.3d at 90; *PenneCom*, 372 F.3d at 493; *Weiss*, 152 N.Y.S.2d 471, 135 N.E.2d at 210. Here, the bribery alleged by Jossem and Reich as the basis for the unclean hands defense is unrelated to the issue of whether Jossem and Reich exercised control over IDTS such as to cause a wrong to IDTS. Therefore, Reich and Jossem cannot claim the defense of unclean hands based on these alleged incidents. *Dunlop–McCullen*, 149 F.3d at 90; *Penne-Com*, 372 F.3d at 493; *Weiss*, 152 N.Y.S.2d 471, 135 N.E.2d at 210. Moreover, Reich and Jossem have not provided any admissible evidence to support the claim that AOOT received bribes. The only evidence they offer is the testimony of Donovan, which is inadmissible hearsay—an out of court statement by Reich offered for the truth of the matter asserted that does not fall under an established exception. *See* Fed.R.Evid. 801(c), 802. Therefore, Reich and Jossem cannot rely upon this evidence to provide a defense of unclean hands.

The request of Jossem and Reich for additional time for discovery is also without merit. Rule 56(f) of the Federal Rules of Civil Procedure provides that, "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Fed.R.Civ.P. 56(f). It is well-established that a party resisting summary judgment on the grounds that the party needs addi-

tional discovery must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999); *Cooney v. Consol. Edison,* 220 F.Supp.2d 241, 247–48 (S.D.N.Y.2002), *aff'd,* 63 Fed.Appx. 579, 2003 WL 21105351 (2d Cir.2003); *see also Estevez–Yalcin v. Children's Vill.,* 331 F.Supp.2d 170, 179–80 (S.D.N.Y.2004). Reich and Jossem have submitted an affidavit stating that they seek additional facts as to the existence and extent of the alleged bribery of AOOT by IDTS. As stated above, the defense of unclean hands is not available in an action for money damages. Moreover, the facts that Reich and Jossem seek regarding the alleged bribery are not related to the issue in this action such that they would allow Reich and Jossem to assert the defense of unclean hands. Therefore, additional discovery regarding these facts could not create a material issue of fact precluding summary judgment. *See Powers v. McGuigan,* 769 F.2d 72, 76 (2d Cir.1985) (affirming district court's granting of summary judgment where nonmoving party requested additional time for discovery because discovery sought would not pertain to material issue of fact); *see also Trebor Sportswear Co. v. Limited Stores, Inc.,* 865 F.2d 506, 511–12 (2d Cir.1989) (affirming district court's granting of summary judgment where nonmoving party requested additional time for discovery because appellants had ample time for discovery and had "proffered no persuasive basis for the district court to conclude that further discovery would yield proof of a written agreement that would satisfy the statute of frauds, which was, after all, the nub of the appellee's motion for summary judgment").

Moreover, further discovery is also denied because "the trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery." *Trebor,* 865 F.2d at 511–12. Here, discovery has been closed for months and, given that Reich and Jossem allege that they were party to the alleged bribery, Reich and Jossem knew of these issues from the start of this action over a year ago and had sufficient time to pursue discovery in this matter. *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 927–28 (2d Cir.1985) ("A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need.")

The request for additional time for discovery is therefore denied.

**V.**

The plaintiff seeks final judgment on the alter ego claims against Reich and Jossem pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Reich and Jossem do not object. (Transcript of Proceedings held June 3, 2005, at 37–38.) Rule 54(b) provides, in relevant part, that the court may enter a final judgment as to one of more claims but fewer than all of the claims "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." In this case there is no just reason for delay, as the parties agree. Enforcement of the 1997 Judgment has already been delayed for a considerable period of time and the ability to recover directly against Reich and Jossem will expedite enforcement of the judgment and is independent of the remaining claims. Similarly, allowing an immediate appeal of that portion of the case will

expedite resolution of this entire case. *See Curtiss–Wright Corp. v. Gen'l Elec. Co.*, 446 U.S. 1, 8 n. 2, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). Moreover, the First Claim for Relief does not present an issue intertwined with the remaining claims so that this Court's ultimate disposition of the remaining claims will moot the decision of the Court of Appeals as to the First Claim for Relief or require the Court of Appeals to decide the same questions twice. *See Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1095–96 (2d Cir.1992). The Court will therefore direct the entry of judgment for the plaintiff on the First Claim for Relief.

## CONCLUSION

For the reasons explained above, summary judgment is granted in favor of the plaintiff JSC and against the defendants IDTS, Reich, and Jossem on the First Claim for Relief which seeks a declaration that Reich and Jossem are, and were at all relevant times, the alter egos of IDTS and are therefore personally jointly and severally liable to satisfy the judgment entered by this Court on July 29, 1997, in *AAOT Foreign Economic Association (VO) Technostroyexport v. International Development and Trade Services, Inc.*, No. 96 Civ. 9056(JGK). The Clerk is directed to enter judgment in favor of the plaintiff and against the defendants on the plaintiff's First Claim for Relief pursuant to Fed. R.Civ.P. 54(b).

**SO ORDERED.**