PER CURIAM:
This appeal calls upon us to address the meaning and scope (under Michigan law) of a notice provision contained in an excess liability insurance policy issued by plaintiff-appellant Lumbermens Mutual Casualty Company (“Lumbermens”), to its insureds, defendants-appellees RGIS Inventory Specialists, LLC (“RGIS”), Robert M. Birardi (“Birardi”), and Camrac Inc. (“Camrac”). We hold that, under the specific circumstances of this case, defendants provided timely notice within the meaning of the excess liability insurance policy’s notice provision, and therefore affirm the judgment of the district court.
BACKGROUND
The instant dispute arises out of an April 2003 accident in which non-party Robert Shore was struck and injured by a minivan owned by Camrac and driven by Birardi in the course of his employment with RGIS. Birardi was driving eastbound on an unilluminated two-lane highway in Middlebury, Connecticut in the early morning hours of April 8, 2003. According to a Middlebury Police Department Incident Report, “[i]t had snowed throughout the previous evening and ... a light drizzle of freezing rain was occurring.” J.A. 1072. “The travel portion of the roadway was restricted due to ongoing snow removal operations,” J.A. 1067, and Birardi was driving at between 30 and 40 miles per hour, well below the posted 45 mile per hour speed limit. After cresting a hill, Birardi’s vehicle suddenly encountered Shore, who was dressed in dark clothing and — in violation of Connecticut law[1] — was walking westbound in the narrow plowed portion of the eastbound travel lane of the highway. Birardi had no opportunity to brake or avoid a collision, and his vehicle immediately struck Shore and threw him to the side of the road.
Meanwhile, a patrol car operated by Middlebury Police Officer Anthony Quiequaro was approaching from the westbound side of the highway, and observed *48 the accident as it occurred. Officer Quicquaro called for medical assistance, and brought his vehicle around to the accident scene. On May 11, 2003, Officer Quiequaro submitted an Incident Report after completing his investigation of the accident, concluding as follows:
Primary responsibility rested on Shore who should have been walking as far to the side of the roadway as possible. Because of the snow on the side of the roadway, the bare pavement section of the roadway was restricted to approximately 7-7.5 feet. With the width of the van at approximately 6 feet, there left very little room for safe passage. Shore chose to walk on the bare pavement. As a result the minivan struck Shore while the van was still operating within all legal parameters. This officer personally witnesses the collision and saw that the minivan did not have enough reaction time to perform any type of evasive maneuver.
J.A. 1074.
All three defendants were covered by a $2 million primary liability policy issued by United States Fidelity & Guaranty Company (“USF & G”), a non-party, and a $25 million excess liability policy issued by Lumbermens (“the Excess Policy”). Birardi immediately reported the accident to his employer (defendant RGIS), RGIS immediately notified its third-party claims administrator, Gallagher Bassett Services, Inc. (“Gallagher Bassett”), and Gallagher Bassett, in turn, timely notified USF & G, the primary insurer. In the meantime, Shore’s counsel sent Camrac a letter of representation. Gallagher Bassett and Discovery Managers, Ltd., the claims managing agent for USF & G, thereafter conducted an accident investigation, began negotiations with Shore’s counsel, and retained an automobile-accident defense firm, Celia, Flanagan & Weber, P.C. (“the Celia firm”) to assist them in evaluating the claim.
Beginning almost immediately after the accident, Gallagher Bassett and the Celia firm issued a number of reports and assessments of the Shore claim. Throughout 2003 and early 2004, Gallagher Bassett attributed 0% fault to the defendants. On April 30, 2004, Gallagher Bassett noted that “[w]e have determined liability at 0% client,” assessed liability as “doubtful,” but nevertheless recommended that counsel be retained “[d]ue to the nature of this claim and voluminous records received by the claimant’s attorney.” J.A. 558-59. On July 28, 2004, Gallagher Bassett reiterated its belief that Shore bore responsibility for the accident, but recommended increasing reserves “due to the details of accident/inj[uries].” J.A. 561-62. On August 19, 2004, the Celia firm issued a “Liability Damages Opinion Letter,” estimating the full value of Shore’s claim (without regard to comparative fault)[2] as being between $1.25 million and $4 million, noting that “[i]f the claimant is found to be more than 50% at fault ..., his comparative fault will act as a bar to recovery,” and concluding that, based on the police officer’s eyewitness report, “the chances of prevailing on liability issues is 90%.” J.A. 566, 570. An October 29, 2004 report from Gallagher Bassett reiterated that it had “determined liability at 0% client,” and noted that “[t]he likelihood of prevailing at trial is 90%.” J.A. 572, 574.
On March 1, 2005, the Celia firm issued a litigation report, which (1) concluded that “[i]t is quite likely that a jury would assign *49 in excess of 50% comparative fault to the plaintiff barring recovery on this action,” (2) observed that “this matter poses significant risk given the massive injuries suffered by the claimant, his medical bills, and the future cost of care,” (3) noted that “even a slight risk of plaintiffs verdict poses a substantial risk of a large award,” (4) estimated the “full value” of the claim as being between $1.25 million and $4 million without regard to comparative fault; and (5) recommended filing reserves in the amount of $750,000. J.A. 580-83. A June 20, 2006 letter from the Celia firm (1) noted that the fact that the accident occurred halfway down a hill, rather than halfway up the hill as was initially thought, “negatively impacts the defense of this case,” (2) estimated the “full jury value” of the case at approximately $4 million without regard to comparative fault, and (3) concluded that although it had become “apparent” that there was a less than 90% chance of prevailing on liability, there was still a “70% chance of securing a defendant’s verdict,” noting that Shore had “a difficult burden to overcome.” J.A. 615— 17. Based on the foregoing analyses, reserves for the Shore claim were never increased above $1.15 million ($1 million for liability and $150,000 for defense costs).
On February 10, 2005, Shore’s representative filed suit against the defendants, and in May 2005, Shore’s damages expert valued the claim at $3.7 million. The parties participated in a mediation in June 2007. In its pre-mediation report, the Celia firm noted that it continued to “believe [it had] a strong chance of securing a defense verdict on the comparative fault special defense.” J.A. 219 (noting that “this case presents the rare situation where the chance of a defense verdict outweighs the chance of a plaintiff verdict”). The report nevertheless noted, however, that the most likely scenario “should a jury return a plaintiffs verdict, presently consists of the 50% comparative fault threshold, which would permit the plaintiff to recover” between $1.5 million and $3.5 million. Id. (emphasis added). At the June mediation, Shore’s counsel stated that he was confident that the jury would return a verdict for Shore, and estimated only a 20 to 25% reduction in damages for comparative fault. Shore’s counsel’s initial settlement demand was $9.5 million, which he lowered to $7.5 million, while defense counsel made two settlement offers: $50,000 and $100,000. Settlement discussions continued through January 2008, but ultimately were unsuccessful.
On January 14, 2008 (nearly five years after the accident and on the eve of trial), RGIS (through its primary insurer and Gallagher Bassett) notified Lumbermens of the Shore action. Lumbermens issued a reservation of rights letter that same day, contending that the insureds had violated the Excess Policy’s notice condition, and observing that the Excess Policy “confers no obligation on [Lumbermens] to respond to this matter until such time as all underlying limits are properly exhausted.” J.A. 1040. Lumbermens thereafter issued a notice of disclaimer, contending that it had not received timely notice of the claim, and refusing to indemnify the insureds or provide them with a defense.
Meanwhile, the Shore action proceeded to trial. On January 30, 2008, the jury returned a verdict for Shore, allocating 100% of liability to the insureds, and on February 13, 2008, the jury awarded approximately $11 million in damages.
Lumbermens commenced the instant action on February 6, 2008, seeking a declaratory judgment to the effect that defendants are not entitled to coverage under the Excess Policy for the Shore claim because of defendants’ untimely notice. As noted, the Lumbermens $25 million policy *50 is excess over the $2 million primary USF & G policy. The Excess Policy provides, in part, that:
We will pay only the amount in excess of the sums actually payable under the terms of the “underlying insurance.” No other obligation or liability to pay sums or perform acts or sendees is covered unless explicitly provided for.... In the event the duty of the underlying insurer to defend the insured against a “suit” ceases solely because the applicable limit of insurance is used up in the payment of judgments or settlements, then we shall assume the duty for such defense.
J.A. 834. The primary policy, by contrast, acknowledges the primary insurer’s “right, duty, and ultimate authority to investigate, defend or settle any claim or ‘suit’ asking for damages.” J.A. 818.
The Excess Policy requires notice of “an ‘occurrence’ or an offense whenever it appears likely it will result in a claim involving ” excess coverage, and notice of a claim or suit “whenever it appears likely that such claim or ‘suit ’ will involve ” excess coverage. J.A. 845 (emphases added). The Excess Policy also requires copies of demands, notices, summonses, or legal papers received “in connection” to a claim or “suit” to be furnished only “whenever it appears likely that the claim will involve” excess coverage or where Lumbermens has “assumed the duty to defend” the insured. Id. The USF & G primary policy, by contrast, requires notice “as soon as possible ” of (1) “an accident which may result in a claim or ‘suit’ seeking a total amount of damages ... in excess of the self-funded retention,” (2) “each claim or ‘suit’ which involves serious injury(ies) or damage(s)”; and (3) “each claim or ‘suit’ which has, should have, or is likely to have, without regard to liability, a reserve equal to or exceeding thirty-three and one third percent (33 1/3 %) of the self-funded retention.” J.A. 821-22 (emphasis added).
After the instant action was filed, the parties cross-moved for summary judgment. On January 21, 2009, the district court granted summary judgment for defendants and denied summary judgment for Lumbermens, finding that, under Michigan law,[3] defendants “provided timely notice within the meaning of the Excess Policy.” District Court Opinion at 10. In so concluding, the court observed that “[ejvery professional who investigated the accident on behalf of RGIS and Birardi found that any finding of liability against the Defendants was unlikely, i.e., less than 50%, and that the claim should be fully resolved well within the limits of the Primary Policy.” Id. at 9. As a result, the court found that defendants “believed that they would likely be held not liable, or, if they were held liable, that they would be liable for only a small amount of damages, due to Connecticut’s comparative fault statute.” Id. (emphasis in original). The court thus concluded that defendants had no obligation to notify Lumbermens until “the accident, claim or suit appeared probable, or more likely than not, to exceed more than $2 million.” Id. at 8. The court also rejected Lumbermens’ claims of prejudice as unsupported and speculative. Id. at 11.
The district court entered final judgment on January 22, 2009, and the instant appeal followed. Meanwhile, in the Shore action, defendants filed a notice of appeal to the Connecticut state appellate court. The parties in that action participated in *51 formal mediation, and, while the instant appeal was pending, Shore accepted an offer to settle the case for $6 million. By summary order dated December 11, 2009, this panel dismissed Lumbermens’ appeal, vacated the district court’s judgment, and remanded the case to the district court with instructions to consider whether that settlement rendered this declaratory judgment action moot. See Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, 356 Fed.Appx. 452, 455 (2d Cir.2009) (summary order). The district court, in turn, determined that this action is not moot, reinstated its original opinion granting defendants’ motion for summary judgment, and dismissed Lumbermens’ complaint. See Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, No. 08 Civ. 1316, 2010 WL 2017272 (S.D.N.Y. May 20, 2010). Lumbermens promptly restored jurisdiction to this Court by letter dated May 20, 2010. With our jurisdiction restored, we now turn to the merits of Lumbermens’ claim.
DISCUSSION
We review the grant of summary judgment de novo, “examining the evidence in the light most favorable to, and drawing all inferences in favor of, the nonmovant.” Sheppard v. Beerman, 317 F.3d 351, 354 (2d Cir.2003). In so doing, we “utilize[ ] the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.” D’Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). Where, as here, there are cross-motions for summary judgment, “each party’s motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.” Morales v. Quintel Entm’t, Inc., 249 F.3d 115, 121 (2d Cir.2001).
The central question presented here is whether defendants provided timely notice of the Shore claim as required by the Excess Policy’s notice provision. The answer to that question turns on the language of the notice provision itself and the reasonableness of defendants’ belief that it was highly unlikely that the primary insurance policy limits would be exhausted. For the following reasons, we are satisfied that defendants’ notice was timely, and thus see no error in the district court’s grant of summary judgment dismissing Lumbermens’ action.
Under Michigan law, we “give the language contained within [an insurance] policy its ordinary and plain meaning so that technical and strained constructions are avoided.” Amway Distribs. Benefits Ass’n. v. Northfield Ins. Co., 323 F.3d 386, 392 (6th Cir.2003) (citation omitted). We are required to “enforce the contract as written if it fairly allows but one interpretation,” Morley v. Auto. Club of Michigan, 458 Mich. 459, 581 N.W.2d 237, 240 (1998), and our ultimate goal is to enforce the agreement intended by the parties. See Engle v. Zurich-American Ins. Grp., 230 Mich-App. 105, 583 N.W.2d 484, 485 (1998). Here, as noted, the Excess Policy requires notice of “an ‘occurrence’ or an offense whenever it appears likely it will result in a claim involving” excess coverage, and notice of a claim or suit “whenever it appears likely that such claim or ‘suit’ will involve” excess coverage. J.A. 845. Such language, on its face, does not require notice of all claims for amounts that exceed the primary policy’s limits of $2 million. Rather, the notice provision plainly refers to the likelihood of the Excess Policy actually being implicated through liability once the primary coverage is exhausted. See Aetna Cas. & Sur. Co. v. *52 Dow Chem. Co., 10 F.Supp.2d 800, 807, 829 (E.D.Mich.1998); see also Sudul v. Coregis Ins. Co., No. 214715, 2001 WL 633698, at *4 (Mich.App. May 25, 2001) (treating similar language as referring to the likelihood of a policy being implicated through liability “once the limits of all underlying insurance were exhausted”). In Aetna, as the dissent notes, the court interpreted a notice provision similar to the one in issue here to require the insured “to give notice when ‘it has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages, which, in the event that the Assured should be held liable, is likely to involve this Policy,’ ” 10 F.Supp.2d at 807 (original emphases omitted), but the court also concluded that an occurrence would be “likely to involve” the excess policy only in those instances where the insured reasonably concluded that the primary policy would be exhausted, id. at 829.
The Excess Policy further limits the insured’s notification duties to those specific circumstances in which it “appears likely” that a claim “will” involve the Excess Policy. Thus, on its face, the Excess Policy does not require notice to be given when it appears “possible” that a claim “may” or “might” involve the Excess Policy; nor does the policy require notice whenever a claim involves serious injuries or high monetary demands. Indeed, the Excess Policy’s language in this respect stands in stark contrast to the notice provision contained in the primary policy, which requires notice — without regard to liability— of all claims that “involve! ] serious injury(ies) or damage(s)” or exceed a certain threshold amount.[4] J.A. 821-822. Moreover, unlike certain other notice provisions previously interpreted under Michigan law, the notice provision here does not require notice whenever an insured “has information from which [it] may reasonably conclude” that a policy would be implicated “in the event [the insured] should be held liable.” Assoc. Indemnity Corp. v. Dow Chem. Co., 248 F.Supp.2d 629, 645, 647 (E.D.Mich.2003) (interpreting such language to require notice “when [the insured] had information before it from which it may — in the sense of ‘could’— reasonably conclude that it is likely to involve its insurers”).
Lumbermens could have used any of these formulations when drafting the Excess Policy’s notice provision, but chose not to do so. Instead, as noted, the policy only requires notice when it “appears likely” that a claim “will” involve excess coverage. Thus, under the express terms of the Excess Policy’s notice provision, defendants were required to provide notice to Lumbermens only when a claim or occurrence appeared probable — as in more likely than not — to exceed the primary policy’s $2 million limits. See Black’s Law Dictionary 925 (6th ed.1991) (defining “likely” to mean “of such nature or so circumstantial as to make something probable and having better chance of existing or occurring than not”); Moll v. Abbott Labs., 444 Mich. 1, 506 N.W.2d 816, 827 (1993) (same).
In light of these express terms, we find no error in the district court’s conclusion that, as a matter of law, defendants provid *53 ed timely notice of the Shore claim to Lumbermens within the meaning of the Excess Policy. The undisputed evidence shows that, upon receiving timely notice of the Shore claim, defendants’ primary insurer and third-party claims administrator conducted an investigation and retained outside counsel to assist with assessing and defending the claim. The third-party claims administrator and defense counsel thereafter repeatedly evaluated defendants’ potential exposure, and issued a number of reports and assessments of the underlying claim, each of which emphasized that Shore bore primary responsibility for the accident. Reserves for the underlying claim were never raised above $1 million for losses (well within the primary policy’s limits), and at no point prior to trial did anyone (other than plaintiffs counsel) indicate that a finding of liability was “likely” or “more probable than not.” To the contrary, the claims administrator and defense counsel repeatedly emphasized that, at the very most, Shore had a 30% chance of prevailing, and that even if Shore prevailed, any recovery would be tempered by Connecticut’s modified comparative fault statute. In the face of such repeated, consistent, and unequivocal assessments — all of which directly bear on whether it appeared “likely” that Shore’s claim would reach the Excess policy — we find no error in the district court’s grant of summary judgment in defendants’ favor.
Lumbermens argues that, at the very least, questions of fact remain as to the reasonableness of defendants’ reliance on the advice that it received regarding the underlying claim. Lumbermens has failed, however, to point to any evidence that calls into question the reasonableness of such advice, and no evidence indicates that defendants ever subjectively believed that it appeared “likely” that the Excess Policy would be implicated. Indeed, the record indicates that the advice that defendants received, which consistently indicated that the claim was unlikely to involve the Excess Policy, was tempered by and took into account the concerns that Lumbermens raised. Although Lumbermens makes much of the fact that it was immediately apparent that Shore suffered serious injuries from the accident, such an approach “oversimplifies] the issue of [defendants’] notice requirement,” Aetna Cas. & Sur., 10 F.Supp.2d at 829, particularly given that our assessment of whether defendants’ notice was untimely under that provision necessarily turns on the strength of Shore’s negligence claim, not on the nature or extent of Shore’s injuries. Under such circumstances, and in light of the fact that insurers cannot “us[e] hindsight to support a late notice defense,” Aetna Cas. & Sur., 10 F.Supp.2d at 809, it was objectively reasonable for defendants to rely on the advice that they received indicating that the underlying claim was not likely to trigger the Excess Policy.
In short, we are satisfied that defendants’ notice was timely, and see no error in the district court’s grant of summary judgment dismissing Lumbermens’ action. For that reason, we need not address the district court’s alternative ruling that Lumbermens failed to show actual and material prejudice.
CONCLUSION
For the foregoing reasons, we AFFIRM the judgment of the district court.

. Connecticut General Statute § 53-182 ("Use of highways by pedestrians”) prohibits pedestrians from improperly using the travel lanes of state roadways.

. Connecticut has a modified contributory negligence statute, whereby a claimant who is more than 50% responsible for his injuries is not entitled to recovery. See Conn. Gen.Stat. § 52-572h.

. None of the parties here challenges the district court's decision to interpret the Excess Policy under Michigan law.

. The difference between the policies’ respective notice provisions reflects the general distinction between primary and excess insurance policies. “Since excess coverage is contingent on exhaustion of primary or underlying policies, excess insurers generally do not require notification of occurrences until the excess policy is reasonably likely to be implicated. Consequently, insurance policies for excess coverage grant the insured some discretion in evaluating the case.” Santos v. Farmers Ins. Exch., No. 07-11229, 2008 WL 506351, at *4, 2008 U.S. Dist. LEXIS 13238, at *11-12 (E.D.Mich. Feb. 22, 2008) (applying Michigan law).