SENTRY INSURANCE a Mutual
Company, Plaintiff,

v.

BRAND MANAGEMENT INC. a/k/a
Budget Services, Inc., and Dynamic
Claim Services, Inc., Defendants.

Sentry Insurance A Mutual
Company, Plaintiff,

v.

Budget Services, Inc. and Hershel
Weber, Defendants.

Nos. 10–CV–0347 (ENV)(RLM),
11–CV–3966 (ENV)(RLM).

United States District Court,
E.D. New York.

Signed Aug. 13, 2015.

Laura M. Zulick, Drinker Biddle and Reath LLP., Philadelphia, PA, Stephen Russell Harris, Drinker Biddle & Reath LLP., New York, NY, for Plaintiff.

Henry Neal Conolly, McNamee Lochner, Albany, NY, Avrom R. Vann, Avrom R. Vann, P.C., New York, NY, for Defendants.

### MEMORANDUM & ORDER

ERIC N. VITALIANO, District Judge.

Plaintiff Sentry Insurance ("Sentry") commenced two separate actions arising

out of essentially the same occurrences against defendants Brand Management, Inc. ("Brand"), in one complaint, and Budget Services, Inc. ("Budget") and Hershel Weber, in the other, which interpose a variety of claims and theories of liability, including breach of contract, unjust enrichment, trademark infringement, false designation of origin, dilution by tarnishment, dilution of trademark, deceptive trade practices, and alter ego liability. Following consolidation of the two actions, plaintiff filed the instant motion for partial summary judgment with respect to its breach of contract claim and on its theory of alter ego liability. Budget and Weber filed a cross-motion for partial summary judgment on Sentry's alter ego liability claim. Incidentally, for having had to defend the cross-motion, Sentry seeks attorney's fees.

What started as a disagreement over workers' compensation insurance contracts has denigrated into a war of attrition over discovery matters. At bottom, as explained further below, there can be no real dispute that Brand and Budget breached their contract with Sentry. Nor are there any facts properly before the Court that can refute plaintiff's alter ego liability theory. Simply, as a matter of law, Brand and Budget are alter egos of Weber, who is, therefore, liable for Brand's breach of contract. Consequently, plaintiff's motion for partial summary judgment must be granted, and the cross-motion of Budget and Weber denied.

### Background

#### I. *Procedural History*

Pressing a basic breach of contract claim as its core grievance, Sentry, on January 27, 2010, sued Brand. (Compl., ECF No. 1, at ¶¶ 5–6).[1] The case actually proceeded

to trial, but, with testimony underway, Brand filed a voluntary bankruptcy case without warning. It announced the strategic ploy at trial and in open court only after confirming that the bankruptcy petition had, in fact, been filed. (Minute Entry, ECF No. 49). In compliance with the bankruptcy stay, on August 9, 2011, a mistrial was declared. (Mem. & Order, ECF No. 51). Eight days later, on August 17, 2011, Sentry brought an action against Budget and its owner, Weber, which arises out of the same facts, and the same contract, as the then-stayed action against Brand. (Compl., 11–CV–3966, ECF No. 1, at ¶¶ 44–55). Subsequent to these maneuvers, the bankruptcy court dismissed Brand's bankruptcy case because, the bankruptcy court found, Brand's filing "border[ed] on bad faith." (Order, 11–bk–46230, ECF No. 49). Freed of the stay, the two district court actions were then consolidated. (Order, ECF No. 55).

With gratitude for the able pre-trial management of Magistrate Judge Roanne L. Mann, the parties were able to emerge from discovery and proceed to motions seeking partial summary judgment. The course of discovery, however, was more than difficult. It was marred by the strategy and guile of defendants, who engaged in conduct that can best be described as recalcitrant and sanctionable. After systematically ratcheting up discovery orders and sanctions, finally, Magistrate Judge Mann issued a Report and Recommendation ("R & R"), on February 7, 2013, which recommended that the Court impose a still harsher sanction: precluding defendants from presenting evidence in opposition to plaintiff's alter ego claim. (R & R, ECF No. 179). On October 21, 2013, the Court agreed, adopting the R & R in full, which

---

1. All citations to the electronic case filing system ("ECF") refer to filings under docket

number 10–CV–0347 unless otherwise noted.

thereby precluded defendants "from offering evidence opposing Sentry's alter ego claim, for the purposes of both summary judgment and trial." *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 F.R.D. 1, 8 (E.D.N.Y.2013).[2]

Following the close of the cantankerous discovery phase of the litigation, on May 30, 2014, plaintiff filed the instant motion for summary judgment, (Pl.'s Mot., ECF No. 223), which has drawn a cross-motion for summary judgment by Budget and Weber. (Defs.' Mot., ECF No. 225). Trading legal salvos, the parties first war over what facts the Court may rely upon to decide these motions. From one trench, Sentry objects to affidavits, (Weber Decl., ECF No. 225-2; Rosenfeld Decl., ECF No. 225-4), Budget and Weber submitted in opposition to Sentry's motion, arguing that they are proffered in clear contravention of the Court's October 21, 2013 Order.[3] (Pl.'s Reply Br., ECF No. 227, at 2-3). On the other side of the front, Budget and Weber, barricaded in their own trench, submit that Sentry wrongfully used depositions taken before the Brand and Budget actions were consolidated, *i.e.*, to be used against Budget and Weber, who were not parties when the depositions were taken. (Defs.' Br., ECF No. 225-6, at 13).

First and foremost, despite their legal flailings, Budget and Weber cannot wriggle away from the devastating impact of the Order barring their opposition to Sentry's alter ego theory of liability. *See In re Goldstein*, 430 F.3d 106, 110 (2d Cir. 2005). Those declarations will not be considered. As for Budget and Weber's objection to Sentry's use of particular depositions,[4] the Court will not rely, to the extent it is material, on testimony from any deposition where Budget or Weber were neither noticed as a party nor present. *See Bascom Launder Corp. v. Telecoin Corp.*, 15 F.R.D. 277, 277-78 (S.D.N.Y.1953); *In re Socony Vacuum Transp. Co.*, 93 F.Supp. 718, 721-22 (S.D.N.Y.1950). The precluded submissions of both sides will not be considered.

II. *Factual Background*

Weber is the president of Spring Services, through which he "take[s] care of a whole bunch of corporations," (the "Weber entities"). (Weber Dep. ("WD1"), ECF No. 226, Ex. 9, at 6:12-14). As Weber puts it, these constituent entities "pay Spring Services and Spring Services pay[s] me." (*Id.*). Most of the Weber entities are "professional employment organizations" ("PEOs"), which provide employee leasing[5] and payroll services to health-

---

2. Familiarity of the parties with this decision and the underlying controversy is presumed and will not be repeated here in detail.

3. Sentry also seeks default judgment against Budget and Weber, contending that their cross-motion was similarly prejudicial. While defendants' cross-motion was not authorized, the same can said of Sentry's motion for default judgment. In any event, the offense taken hardly warrants such severe punishment. Default judgment is denied. Similarly, since the defense of defendants' cross-motion is inextricably intertwined with its own motion for partial summary judgment,

Sentry's request for attorney's fees is also denied.

4. The Court presumes Budget and Weber are referring to the depositions of Esther Ziegler, Leib Halberstam, Kathleen Fleming, and Nachum Singer, all which were taken before the January 19, 2012 consolidation of the Brand and Budget actions. (ECF No. 223-3, Ex. F–H; ECF No. 226, Ex. 11).

5. According to Weber, "employee leasing" refers to an arrangement where his client "nursing home[s] hire[ ] ... nurses and they call it in to us and we pay the nurses." (WD1 at 8:10-9:22).

care-related entities, such as nursing homes, and provide workers' compensation insurance for the benefit of leased employees. (Pl.'s R. 56.1 Statement ("S"), ECF No. 223–2, at ¶¶ 5–7). Each PEO has one or two employees who "do[ ] the work for their nursing homes." (WD1 at 12:21–14:25, 20:4–9, 29:9–11). Weber maintains that it is beneficial to have "multiple corporations doing the same thing" because "[i]t makes the bookkeeping system easier because it's split up." (*Id.* at 13:4–8). The Weber entities operate from one office on South Eighth Street in Brooklyn and, although they each have separate checking accounts, the office expenses and employee salaries are aggregated and paid for by Spring Services. (S at ¶¶ 17–19; WD1 at 15:11–16:17, 18:6–8, 20:4–12).

Budget and Brand are PEOs. They are located at the shared South Eight Street office. (S at ¶¶ 1–2, 16; WD1 at 16:14–17). Like the other Weber entities, Brand and Budget are owned and operated by Weber. He is the controlling shareholder,[6] serves as president and director of each, and is responsible for their daily operations. (S at ¶¶ 9–11). The only other designated officer is Weber's son, Naftoly Weber ("Naftoly"), who maintains a partial interest in Budget "for tax reasons." (*Id.* at

¶¶ 39, 43, 45–46; WD1 at 46:21–24). There is typically one annual board of directors meeting, and Naftoly attends on some occasions. Significantly, Naftoly is otherwise not engaged with the business and has no familiarity with or authority over business operations. (S at ¶¶ 42–44, 48–49; Naftoly Dep., ECF No. 223–3, Ex. P, at 7:21–9:18).

Weber admits that, on numerous occasions, he transferred funds among the Weber entities. He claims the transfers were "loans" that bore no interest. (Defs.' Br., ECF No. 225–6, at 14). Describing the dealings further, Weber says that whenever one of his entities "need[ed] money," one of these loans would be made. (S at ¶¶ 20–21; Budget Admis., ECF No. 226, Ex. 3, at 17, 19; WD1 at 74:2–5). Further, evidencing the seamlessness of the commingling of funds, the so-called loans were not memorialized in corporate resolutions or ever reduced to written loan agreements.[7] (S at 22; Budget Admis., ECF No. 226, Ex. 3, at ¶¶ 21–22). All of these transactions were, apparently at the drop of a hat, engineered and executed solely by Weber. (Budget Admis., ECF No. 226, Ex. 3, at ¶ 18). It is clear that corporate formalities and, effectively, cor-

---

6. Weber holds a 100% ownership stake in Brand and an 87% ownership stake in Budget, with the remaining 13% owned by Naftoly. (Weber Resp. to Interrog., ECF No. 226, Ex. 2). Weber also owns 100% of at least eight of the Weber entities, and 40% or more of at least 17 others. (*Id.*).

7. The record contains solid evidence of these inter-entity fund transfers. For instance, "A Best Management," "County Agency," "US Management," and "Value Management" each "loaned" funds to Brand, at Weber's direction, because Brand simply "needed money." Brand never repaid the "loans." (S at ¶¶ 26–29; WD1 at 87:9–93:3). Likewise, a complete set of corporate minutes for regularly scheduled meetings, for either share-

holders or directors, has not been produced in this action because, as Weber asserts, he cannot locate them. (S at ¶ 41; Weber Aff., ECF No. 226, Ex. 12, at ¶ 3). The record contains several haphazardly produced minutes from meetings of some of the Weber entities. In 2012, Weber and Budget produced minutes dated February 3, 2010 for various Weber entities, as well as minutes for a "special meeting" of Budget's stockholders held on February 27, 2012. There were no minutes produced for the year 2011. (Schwarzbaum Aff., ECF No. 226, at ¶¶ 30–32, Ex. 8, 12). None of the limited production of documents reflects the indicia or approval of any inter-corporate loan transactions.

porate boundaries were seldom honored. (S at ¶ 24; WD1 at 71:25–72:18).

Weber, apparently, also personally entered into similar loan transactions to and from Budget and Brand without any corporate resolutions or written loan agreements. (S at ¶¶ 30–31). On one occasion, Weber loaned $749,333 from his personal account to Brand so that it could pay for workers' compensation insurance. (*Id.* at ¶ 32; WD1 at 91:14–18). Weber used personal checks for business purposes if one of his businesses lacked funds. (S at ¶ 33; WD1 at 130:22–131:15). He also kept Brand's checkbook at home and managed to repay himself for loans made out of his personal funds. (S at ¶¶ 34–37; WD1 at 42:8–15, 96:8–99:14; Weber Dep. ("WD2"), ECF No. 223–3, Ex. F, at 103:5–16). From January 2007 to October 2010, Budget made eight loans to Weber that, combined, exceeded $157,000. (S at ¶ 38; Budget Admis., ECF No. 226, Ex. 3, at ¶ 19). Even Naftoly received loans from Budget in 2009 and 2010, but Weber cannot specify what the loans were for. (S at ¶¶ 50–51; Budget Admis., ECF No. 226, Ex. 3, at ¶ 20; WD1 at 43:16–20). Money moved back and forth among Weber, his son, and his businesses like a tennis ball does at Wimbledon.

With Weber's corporate infidelities as a backdrop, the dispute on center court arises out of two workers' compensation and employer's liability insurance policies (the "workers' compensation policies") purchased from Sentry by Budget and Brand, which were effective for a one-year period beginning September 30, 2008. (S at ¶¶ 13, 56, 62–65; Am. Compl., ECF No. 7–2, Ex. A). The workers' compensation policies listed a number of Weber's PEOs as insureds and additional insureds, including Budget. (S at ¶¶ 14, 61). Beyond that coverage, on or about October 28, 2008, Budget, Brand, and Sentry entered into a casualty insurance agreement in which Budget and Brand agreed to reimburse Sentry for any costs and expenses incurred by Sentry under the workers' compensation policies if Budget and Brand's deductible was not paid within 20 days of the end of each calendar month. (S at ¶¶ 57–59; Am. Compl., ECF No. 7–3, Ex. B). To pay the premiums on the workers' compensation policies, Budget and the Weber entities would submit checks to Brand, which would, in turn, submit the payments to Sentry. (S at ¶¶ 62, 64; WD1 at 31:8–11; WD2 at 104:7–19).

The workers' compensation policies had high-deductibles but low premiums, meaning, practically, that Budget and Brand accepted nearly all the risk. (S at ¶ 55; Halberstam Dep. ("HD"), ECF No. 226, Ex. 11, at 49:24–50:10). Under the agreement, Brand and Budget were required to pay a "recoverable deductible" of $1 million per claim with Sentry advancing payments on claims and billing Budget and Brand for any payments advanced by Sentry when payouts did not exceed $1 million. (S at 68; Am. Compl., ECF No. 7–2, Ex. A–B; HD at 42:16–43:13). Brand's risk manager, Leib Halberstam, said he believed, despite the high assumption of risk, that Brand could limit its liability by aggressively challenging workers' compensation claims. (S at ¶¶ 53–54; HD at 49:14–50:22). Because no claim ever exceeded $1 million, Budget and Brand were obligated to repay all claims, costs, and reserves under these policies. (S at ¶ 68; HD at 43:10–13). To ensure a current and accurate accounting of their mutual obligations, Sentry provided Brand with monthly invoices, which detailed individual claim information as well as any amounts owed to Sentry. (S at ¶ 84; Harris Decl., ECF No. 223–3, Ex. K, L, M, S). In the meantime, of course, the arrangement securing Sentry's interface in the process satisfied Brand's obligation as an employer

to have workers' compensation and disability insurance in place.

In September 2009, when the workers' compensation policies were set to expire, Brand, which had an obligation to pay premiums for both itself and Budget, abruptly stopped paying Sentry. Sentry interpreted the failure to pay premiums as a default under the casualty agreement.[8] (S at ¶¶ 70–73; WD2 at 26:20–27:5; 35:21–24; Compl., No. 11–CV–3966, ECF No. 1, at ¶ 17). Weber, claiming he was not managing Brand at that time, was, allegedly, unaware of why Brand stopped paying: "[Brand is] just running itself." (S at ¶ 74; WD2 at 34:17–39:25). Suspiciously, while Brand ceased making payments to Sentry, it also stopped collecting its accounts receivable, which, by December 31, 2009, exceeded $6.6 million, with $3.8 million of those debts owed by other Weber entities.[9] Sentry, seeking to be made whole on the claims it was still paying on Brand's behalf, sued Brand, "a/k/a Budget," on January 27, 2010. That was followed by more churning in the Weber empire. By the end of 2010, Weber had "deactivated" Budget (meaning all of its clients were merely transferred to other Weber entities), even though it had approximately $32 million in revenues that year, an increase over the previous year. The after-ascribed reason for deactivation was that Budget was having "cash flow problems."[10] (Schwarzbaum Aff., ECF No. 226, at ¶¶ 92–95; Rosenberg Dep., ECF No. 226, Ex. 6, at 50:8–9; Rosenberg Dep. ("RD2"), ECF No. 226, Ex. 10, at 128:4–19:24; Balance Sheet Comparison, ECF No. 226, Ex. 34).

The malarkey did not stop there. As Sentry sought compensation through the courts, on July 20, 2011, Brand filed a voluntary bankruptcy petition seeking Chapter 11 reorganization. According to Weber, Brand declared bankruptcy because Sentry had filed suit. (S at ¶ 85; Bankr.Proceeding, 11–bk–46230, ECF No. 33–2, at 40:39:5–40:23). In bankruptcy court, as the parties recall, it was found that Brand was "purposefully ... undercapitalized," and was undisputed that Brand owed Sentry several million dollars. (S at ¶ 87; Bankr. Proceeding per Rosenthal, J., ECF No. 226, Ex. 33, at 12:24–13:2, 23:11–20). Even after the initiation of the Budget action, on August 17, 2011, for the same breach of the casualty agreement, Sentry continued to pay claims under the workers' compensation policies, (Erler Aff.,

---

8. The casualty agreement provided:

> The Insured's failure to timely pay any of the Obligations shall not be considered a default under this Section 6 if the Insured: a. Disputes, in good faith, an amount owed; b. Presents to the Company within ten (10) days after such amount was due and payable a written explanation of the basis for the Insured's disagreement with the amount stated by Company as owed; and c. Is otherwise current with respect to all other Obligations.

Neither Budget nor Brand ever raised any challenge to Sentry's billing. (S. at ¶¶ 70–71).

9. As of December 31, 2008, Brand was owed $5,184,018 in outstanding accounts receivable. (2008 A/R Aging Summary, ECF No. 226, Ex. 24). As a result of Weber's ability to move of funds between the Weber entities, approximately $2.9 million of Brand's accounts receivable were funds owed by other Weber entities (Budget owed Brand $964,019). (Id.). Approximately 47% of these Weber entities' accounts receivable were outstanding for over 90 days. (Id.). By December 31, 2009, several months after Brand stopped paying Sentry, Brand's outstanding accounts receivable increased to $6,666,032, with $3.8 million of that due from other Weber entities. (2009 A/R Aging Summary, ECF No. 226, Ex. 25). More than half of that amount was outstanding for over 90 days. (Id.).

10. As of February 5, 2013, Budget was apparently reactivated at Weber's direction, because he needed to accommodate a particular client. (RD2 at 129:14–24).

ECF No. 223–4, at 8), and, as of March 31, 2012, it has paid out $4,958,712. More than $4,197,154 remained unpaid to Sentry by Brand and Budget at that time. (S at ¶ 88; Budget Admis., ECF No. 223–3, Ex. R, at ¶¶ 25–26; Weber Admis., ECF No. 223–3, Ex. R, at ¶¶ 27–28). As of November 12, 2013, that amount had increased to $7,455,933. (S at ¶ 90; Harris Decl., ECF No. 223–3, Ex. S).

## Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that a district court may grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *James River Ins. Co. v. Power Mgmt., Inc.*, 55 F.Supp.3d 446, 453 (E.D.N.Y.2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Reeves v. Anderson*, No. 11–CV–3770, 2014 WL 7336459, at *3 (S.D.N.Y. Dec. 24, 2014) (citing *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir.2012)). "In determining if a genuine dispute of material fact exists, 'the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought.'" *Fletcher v. Standard Fire Ins. Co.*, 80 F.Supp.3d 386, 390 (E.D.N.Y.2015) (quoting *Buckley v. Deloitte & Touche USA LLP*, 888 F.Supp.2d 404, 415 (S.D.N.Y.2012), *aff'd*, 541 Fed.Appx. 62 (2d Cir.2013)). "Where, as here, both parties move for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Gen. Star Indem. Co. v. Driven Sports, Inc.*, 80 F.Supp.3d 442, 449 (E.D.N.Y.2015) (quoting *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir.2010)).

In opposing a motion for summary judgment, "it is insufficient for [the nonmoving party] ... 'merely to assert a conclusion without supplying supporting arguments or facts.'" *Id.* (quoting *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996)). "Once the moving party has met its burden, the opposing party 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Id.* (emphasis in original) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994)).

## Discussion

### I. Breach of Contract

■ To succeed on a breach of contract claim, a plaintiff must show: "'(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defen-

dant; and (4) damages.'" *D'Amato v. Five Star Reporting, Inc.,* 80 F.Supp.3d 395, 408 (E.D.N.Y.2015) (quoting *Swan Media Grp., Inc. v. Staub,* 841 F.Supp.2d 804, 807 (S.D.N.Y.2012)). Sentry "does not seek to prove the amount of its damages in connection with its breach of contract claim," and merely requests summary judgment as to liability, (Pl.'s Br., ECF No. 223–1, at 7–16), meaning, in substance, that it is entitled to a partial judgment finding that it has established the first three elements of a contract claim under New York law. Brand stipulates that "it has liability under the insurance contract and is subject to partial summary judgment" because it has failed to pay, but disputes the damages, claiming that "Sentry set upon a course to arbitrarily and significantly increase the amount of the estimates for claims." (Conolly Decl., ECF No. 224–1, at ¶¶ 2–3). Budget and Weber, meanwhile, do not address Sentry's breach of contract claim at all, and, therefore, waive any independent argument they may have against it. *Bajramaj v. Gonzales,* 239 Fed.Appx. 690, 691 (2d Cir.2007).

Because the parties do not dispute the existence of the contracts, Sentry's performance under the contracts, and the breach of those contracts, Sentry's motion for partial summary judgment as to Brand and Budget's breach of contract is granted. Damages remain as the only open issue, which includes defendants' objections as to Sentry's billed invoices.

## II. *Alter Ego Liability*

■ The far more contentious matter is whether Weber, personally, should be held responsible for Brand and Budget's breach of contract liability to Sentry. (Pl.'s Br., ECF No. 223–1, at 16). Sentry alleges that Weber, through his complete domination of their activities, ran Budget, Brand, and the other Weber entities as an extension of himself in a common business enterprise. Sentry rests heavily on compelling evidence showing that the Weber entities utterly failed to maintain "even the most basic formalities," and that, firmly under Weber's thumb, those entities effectively and undeniably were Weber's alter egos. (*Id.* at 18–20). Sentry, for support, cites Brand and Budget's lack of corporate minutes, Weber's unilateral control over the flow of money among the Weber entities and himself, the absence of legitimate annual meetings, the common office space, and the inadequate capitalization of either Brand or Budget. (*Id.* at 18–21). Plaintiff also maintains that Weber committed a "fraud or wrong" by diverting funds away from Brand in order to render it "judgment proof." (*Id.* at 22–23).

Weber and Budget label Sentry's alter ego assertions "purely conclusory," and contend that Sentry has failed to sufficiently plead (much less prove) a valid cause of action to pierce the corporate veil or to impose alter ego liability. (Defs.' Br., ECF No. 225–6, at 3–4). Specifically, they argue that Sentry has failed to particularly plead "that Weber was using the corporate entities to advance his own rather than corporate ends." (*Id.* at 4, 12).

■ Certainly not in dispute is the law that a parent company, or an owner, may "be held liable for the acts of its subsidiary when the subsidiary is merely an alter ego of the parent." *Kiobel v. Royal Dutch Petr. Co.,* 621 F.3d 111, 195 (2d Cir.2010). As the Second Circuit has explained:

> Alter ego liability exists when a parent or owner uses the corporate form "to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted

the dominator's business rather than its own."

*Id.* (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979)). Under New York law, a party seeking to pierce the corporate veil, and thereby hold another entity or individual liable, "must show: (1) the alleged alter ego 'exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil.'" *Liberty Synergistics, Inc. v. Mircroflo Ltd.*, 50 F.Supp.3d 267, 296 (E.D.N.Y.2014) (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp., LLC*, 268 F.3d 58, 63 (2d Cir.2001)).

To determine whether the first requirement, domination, has been met, the following ten equitable factors must be considered:

(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id.* at 296–97 (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F.Supp.2d 461, 464–65 (S.D.N.Y.2005) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick*, 933 F.2d 131, 139 (2d Cir.1991))).

Assuming domination can be established, to recover, a plaintiff must then show "(1) 'the existence of a wrongful or unjust act toward that party,' and (2) that 'the act caused the party's harm.'" *Id.* at 297 (quoting *JSC Foreign Econ. Ass'n Technostroyexport*, 386 F.Supp.2d at 465). There can be no recovery without establishing "that the owners of the corporation, through their dominance of the corporation, 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [the complainant contracting] party such that a court in equity will intervene.'" *Id.* (citations omitted). For instance, "'[t]he stripping of corporate assets by shareholders to render the corporation judgment proof constitutes a fraud or wrong justifying piercing the corporate veil.'" *American Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F.Supp.3d 516, 527 (S.D.N.Y.2014) (quoting *Godwin Realty Assocs. v. CATV Enter., Inc.*, 275 A.D.2d 269, 270, 712 N.Y.S.2d 39 (1st Dep't 2000)).

On the presented facts in this case, equity demands judicial intervention. Defendants' discovery stonewall cannot hide the reality that Sentry sufficiently particularized its alter ego allegations, as required by Rule 9(b). *See United Feature Synd., Inc. v. Miller Features Synd., Inc.*, 216 F.Supp.2d 198, 224 (S.D.N.Y. 2002). Sentry's complaint against Budget and Weber, for example, sets forth Weber's domination over Brand and the other entities, including details of Brand's bankruptcy proceeding, orchestrated by Weber, at which it was noted that Brand was undercapitalized and that dismissal of the

case was required because the petition that Weber directed to be filed, the bankruptcy court charitably found, "border[ed] on bad faith." *(See* Order, 11–bk–46230, ECF No. 49; Compl., 11–cv–3966, ECF No. 1, at ¶¶ 44–55).

Not only is the pleading of the claim sufficient to state the alter ego claim; so is the admissible proof sufficient to establish it. Budget and Weber rely on *Feitshans v. Kahn*, No. 06–CV–2125, 2007 WL 2438411, at *7 (S.D.N.Y. Aug. 22, 2007), to argue against domination by Weber. (Defs.' Br., ECF No. 225–6, at 14–15). *Feitshans* held that summary judgment was inappropriate because several factors demonstrated a genuine issue of material fact regarding domination: (1) the defendant entities were legally-formed, had numerous salaried employees, and had separate bank accounts, books, records, filings, and operating expenses (paid independently); (2) they pursued separate corporate business operations; (3) they merely shared overlapping administrative costs; and (4) there were questions as to the nature of the funds loaned between the entities, including whether any were made at arm's length. *Id.*

While highlighting elements of potential factual dispute, defendants omitted, from their thumbnail review, the critical guidance from the *Feitshans* court—that "the overlap In ownership ..., the [entities'] dependence on the [individual owner] for operating funds, [and] the bare adherence to corporate formalities" each "strongly suggest[ed] domination." *Id.* Here, the admissible, uncontradicted proof shows that there was clear overlap in ownership of all the Weber entities; Weber was the sole or primary shareholder of each of them and the crucial source of the overlapping leadership, by his own admission, as president for each of them. (WD1 at 6:12–14). Eschewing corporate-minute taking, regular board meetings, annual shareholder meetings, and a host of practices indicative of business Independence, corporate formalities were, manifestly, not recognized. Bluntly, the boundaries among entities or between entities and Weber's personal pockets were disregarded repeatedly and, without doubt, disregarded whenever Weber, as the overlord, felt they were inconvenient. (WD1 at 74:2–5, 87:9–93:3, 130:22–131:15; Weber Aff., ECF No. 226, Ex. 12, at ¶ 3). The interdependence of the Weber entities and the dependence of the entire enterprise on Weber personally is unmistakable. (WD1 at 74:2–5, 87:9–93:3, 130:22–131:15). Domination of Brand and Budget by Weber being total and complete is what the admissible proof shows. There is no genuine dispute of fact.

 Second, unlike in *Feitshans*, the Weber entities do not have separate operating expenses, the flow of funds between the constituent parts of Weber's enterprise was not the result of arm's length transactions, and those parts clearly did not operate as independent profit centers. Weber admitted that all the Weber Entities conducted business from his South Eighth Street office and that the office expenses and employee salaries were covered by Spring Services, the command module for the Weber entities. (WD1 at 15:11–16:17, 18:6–8, 20:4–12). Weber had sole discretion over the flow of funds that coursed through Brand, Budget, and the other constituent parts of the greater business enterprise. (Budget Admis., ECF No. 226, Ex. 3, at ¶¶ 17–19; WD1 at 71:25–72:18). In the real world of the Weber business scheme, none of Weber's businesses were actually discrete profit centers—they were all PEOs "doing the same thing," and only existed as separate entities to "make[ ] the bookkeeping system easier." (WD1 at 13:4–8). In that reality, there was only

one large profit-generating machine: Weber himself doing business as Spring Services, and the Weber entities were merely interchangeable parts in that machine. (*See* WD1 at 6:12–7:19). This is not to say that there were no *Feitshans* factors that tilt away from finding alter ego liability. There is proof that the entities were formed as separate legal entities, that they had separate bank accounts, and appropriately shared administrative costs in a shared office space. *See Feitshans,* 2007 WL 2438411, at *7. At the same time, it is not required that every single factor weigh in favor of piercing the corporate veil—a district court need only find that, as a matter of law, "the balance of *Passalacqua* factors weighs in favor of either party," on proven facts not contradicted by other admissible proof. *Id.*

Finally and significantly, there is no genuine dispute about the fact that Weber committed a "wrong," which harmed Sentry. *See American Federated Title Corp.,* 39 F.Supp.3d at 527 (holding that "stripping" entities "through transfers, management fees, and expense payments ... that were effected by [d]efendants' domination ... [was] sufficient to pierce the corporate veil"). He committed that wrong by keeping Brand undercapitalized to avoid its claims. The record evidence shows that, between 2008 and 2009, Brand slowed or stopped collecting accounts receivable. (2008 A/R Aging Summary, ECF No. 226, Ex. 24; 2009 A/R Aging Summary, ECF No. 226, Ex. 25). In September 2009, in a transparent parallel move, while Brand simply did not collect the millions owed to it, it also ceased paying Sentry's invoices. (S at ¶¶ 72–73; WD2 at 26:20–27:5). Then, as Sentry filed suit against Brand for breach of the casualty agreement, Weber suddenly "deactivated" Budget. (Schwarzbaum Aff., ECF No. 226, at ¶¶ 92–95; RD2 at 128:7–129:24). The flim flam involving Brand and Budget did not

go unobserved by neutrals. The bankruptcy court handling Brand's Chapter 11 filing was onto it almost immediately. In dismissing the case, the court found that Brand was merely a "pass through entity," and noted, pointedly, that Brand did not have "any significant working capital" *because* Weber was "purposely keeping this company undercapitalized [; Brand] lost millions of dollars, at least on paper, and they did not capitalize[ ] and they put everybody in jeopardy." (Bankr.Proceeding per Rosenthal, J., ECF No. 226, Ex. 33, at 11:12–12:1, 23:5–14). These hide-and-seek manipulations were made at Weber's direction while, as defense counsel stated, "there's no question that Sentry's claim for several million dollars is valid." (*Id.* at 13:1–18). With no material facts in dispute, it is clear that Weber, as their alter ego, is liable to Sentry for breach of contract to the same extent that Brand and Budget are.

Specifically, in recapitulation, after weighing the *Passalacqua* factors, the Court concludes that Weber is the alter ego of Brand and Budget as a matter of law. Weber, without a doubt, dominated Brand and Budget, in that Weber's manipulation of his business empire perpetrated a wrong by essentially denuding Brand and Budget to render them judgment proof, which has caused Sentry harm. Since the record on summary judgment is devoid of any admissible proof that would create a material dispute of fact barring that conclusion, partial summary judgment as to liability is mandated.

### Conclusion

For the foregoing reasons, plaintiff's motion for partial summary judgment on its claims for breach of contract against Brand and Budget, as well as its claim of breach against Weber, on a theory of alter ego liability, is granted. Defendants'

cross-motion for partial summary judgment is denied.. Plaintiff's motion for attorney's fees for defending defendants' cross-motion is denied. The parties are directed to contact Magistrate Judge Mann to arrange for the prompt entry of a final joint pretrial order, the resolution of any remaining pre-trial issues, and for the scheduling of trial as to all remaining issues.

So Ordered.